## GARTNER et al. v. UNITED STATES.
### No. 11623.

Circuit Court of Appeals, Ninth Circuit.
March 18, 1948.

John L. McGinn, of San Francisco, Cal., and Collins & Clasby and Chas. J. Clasby, all of Fairbanks, Alaska, for appellants.

Harry O. Arend, U. S. Atty., of Fairbanks, Alaska, for appellee.

Before DENMAN, HEALY, and BONE, Circuit Judges.

HEALY, Circuit Judge.

In 1927 appellant Gartner, a resident of Alaska, was adjudged insane by a territorial

---

court and committed to a hospital with which the United States had a contract for the care of Alaska insane. In 1945 the United States brought this suit against Gartner and his estate to recover $9,180.11 as the reasonable cost of the care and maintenance of the patient from the date of his incarceration to October 14, 1942.[1] A defense interposed by answer was that the Congressional appropriations for the care of the Alaska insane during the period covered by the suit had been made solely on a charitable basis with no suggestion of a purpose of exacting reimbursement, in whole or in part from the patients or their estates. The trial court largely ignored this defense. It agreed with the theory advanced by the government, namely, that at common law a right to reimbursement from the estate of the insane person subsisted in the sovereign and that since the common law had been made applicable to Alaska, so far as not inconsistent with statutory enactments, its principles could be invoked by the United States. A verdict was directed in the amount prayed for.

■ As we view it, the problem is one of determining what the federal fiscal policy was rather than of attempting to resolve the question of the sovereign's right, if any, at common law, cf. United States v. Standard Oil Company, 332 U.S. 301, 67 S.Ct. 1604. Congress, as holder of the purse strings, was free to deal with the subject on whatever basis it saw fit, either exacting reimbursement or withholding its hand in that respect as it might choose. From the beginning, as is evident from the various enactments on the subject, it preempted to itself the authority and responsibility for the care and support of the insane of Alaska, even going so far as expressly to withhold from the assembly of the District authority to amend or repeal certain of the statutes appertaining to the matter. See § 3 of the Act of Aug. 24, 1912, 37 Stat. 512, 48 U.S.C.A. §§ 23, 24, 80. Had Congress desired reimbursement for the Treasury outlays it seems unlikely that it would have been content to rest the claim thereto on doubtful common law principles but would itself have spoken.

Accordingly we turn to the relevant congressional enactments in force through the period covered by this litigation. Preliminarily it may be observed that none of the statutes on the general subject of the Alaska insane then in force contained any intimation of a policy of exacting reimbursement from the patients for the cost of their care and support. The specific acts relating immediately to the expense of providing such care went no further than to provide the necessary funds out of the Treasury. The earliest of these specific statutes to which our attention has been called is the Act of June 6, 1900, 31 Stat. 321, setting up a civil government for Alaska. Section 2 of that act provides that the governor shall, "subject to the direction and approval of the Secretary of the Interior, advertise for and receive bids and, in behalf of the United States, contract from year to year with the responsible asylum or sanitarium west of the main range of the Rocky Mountains submitting the lowest bid for the care and custody of persons legally adjudged insane in said district of Alaska; the cost of advertising for bids, executing the contract, and caring for the insane to be paid, until otherwise provided by law, by the Secretary of the Treasury, out of any money in the Treasury not otherwise appropriated, on accounts and vouchers duly approved by the governor and the Secretary of the Interior."

This statute was twice amended and in its original or amended form was continued in force for forty-two years. The amendments to it were effected by the acts of April 28, 1904, 33 Stat. 526, and February 6, 1909, 35 Stat. 601, the material changes being that the responsibility of the governor was transferred to the Secretary of the Interior, and provision was made for annual congressional appropriations. The final form of the statute as taken in the 1909 amendment is shown on the margin.[2]

---

[1] We are informed by government counsel that the suit is a test case out of which will flow numerous suits of like kind in event the ultimate decision is favorable to the government's position.

[2] "The Secretary of the Interior shall, as in his judgment may be deemed advisable, advertise for and receive bids for the care and custody of persons legally adjudged insane in Alaska, and in behalf

The appropriations contemplated by the statute were made annually through the years. So far as the researches of counsel have disclosed, no suggestion was ever made to the Secretary by the committees in charge that contributions be exacted from the insane, pursuant to principles thought to obtain at common law or upon any other theory. Yet Congress could not but have been aware of the inaction of the Secretary in this respect. Silence in these circumstances and over so long a time could spell only approval of the administrative practice.

■ It was not until 1942 that the attitude of Congress underwent a change. By § 9 of the Act of October 14 of that year, 56 Stat. 785, which effected numerous changes in and additions to the existing statutes on the general subject of Alaska insane, it was made the duty of the patients, their guardian, and certain of their relatives, to contribute to the cost of their care in such sums as the Secretary should determine.[3] It is not claimed that this requirement was intended to have retroactive effect and the government places no reliance upon the provision. On the contrary it is conceded, as we think it must be, that the requirement was intended to operate prospectively only.

■ Here again is compelling evidence, if more were needed, of a pre-existing policy of providing for the insane on a purely charitable or non-contributory basis; for presumably Congress could, if it chose, have reached back into the past and imposed the obligations despite the element of unfairness or surprise inherent in such a course. That Congress was not unmindful of these considerations is plain from the provision limiting charges against relatives to costs accruing subsequent to the Secretary's determination. True, like treatment was not accorded the patient, it being the clearly inferable purpose to impose the charges upon him and his estate unconditionally as of the effective date of the act.[4] But beyond this Congress did not go, and there can be no fair doubt that its retraint was deliberate and purposeful.

Of the cognate situation obtaining in United States v. Standard Oil Company, supra, the Supreme Court observed that the exercise of judicial power to establish a new liability would amount to an unwarranted intrusion by the courts into a field properly within the control of Congress and as to a matter concerning which it had seen fit to take no action. The holding in that case requires a reversal of the judgment here.

Reversed.

---

of the United States shall contract, for one or more years, as he may deem best, with a responsible asylum or sanitarium west of the main range of the Rocky Mountains submitting the lowest and best responsible bid for the care and custody of persons legally adjudged insane in Alaska, the cost of advertising for bids, executing the contract, and caring for the insane to be paid from appropriations to be made for such service upon estimates to be submitted to Congress annually." Feb. 6, 1909, c. 80, § 7, 35 Stat. 601, 48 U.S.C.A. § 46.

[3] Section 9 of the Act, now codified as § 48a of Title 48 U.S.C.A., reads: "It shall be the duty of a patient, or his legal representative, spouse, parents, adult children, in that sequence, to pay or contribute to the payment of the charges for the care or treatment of such patient in such manner and proportion as the Secretary may find to be within their ability to pay: Provided, That such charges shall in no case exceed the actual cost of such care and treatment. The order of the Secretary relating to the payment of charges by persons other than the patient, or his legal representative shall be prospective in effect and shall relate only to charges to be incurred subsequent to the order: Provided, however, That if any of the above-named persons willfully conceal their ability to pay, such persons shall be ordered to pay, to the extent of their ability, charges accruing during the period of such concealment. The Secretary may cause to be made such investigations as may be necessary to determine such ability to pay, including the requirement of sworn statements of income by such persons."

[4] This was the interpretation given the provision by the trial court, and the government appears to acquiesce in the interpretation.