## UNITED STATES v. GUY W. CAPPS, Inc.

No. 6541.

United States Court of Appeals
Fourth Circuit.

Argued March 18, 1953.

Decided April 15, 1953.

Joseph Kovner, Attorney, Department of Justice, Washington, D. C. (Warren E. Burger, Asst. Atty. Gen., A. Carter, Whitehead, U. S. Atty. and Austin E. Owen, Special Asst. to the U. S. Atty., Richmond, Va., and Edward H. Hickey, Attorney, Department of Justice, Washington D. C., on brief) for appellant.

W. R. Ashburn, Norfolk, Va., (H. M. Jarvis and Ashburn, Agelasto & Sellers, Norfolk, Va., on brief) for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge:

This is an appeal by the United States from a judgment entered on a verdict directed for the defendant, Guy W. Capps, in an action instituted to recover damages alleged to have been sustained by the United States as the result of alleged breach by defendant of a contract with respect to the importation of seed potatoes from Canada. The District Court denied a motion to dismiss the action. United States v. Guy W. Capps, Inc., 100 F. Supp. 30. Upon the subsequent trial, however, the court directed a verdict and entered judgment for defendant on the ground that there was no sufficient showing of breach of contract or damage to the United States.

The contract sued on has relation to the potato price support program of 1948 and the executive agreement entered into between Canada and the United States through the Canadian Ambassador and the Acting Secretary of State of the United States. Pursuant to the Agricultural Act of 1948, Public Law 897, 80th Cong. 2d Sess., 62 Stat. 1247, the United States committed itself to purchase from eligible potato growers, directly or through dealers, all table stock and seed potatoes that could not be sold commercially at a parity price. The purchase and disposal of potatoes under this program was carried out by the Commodity Credit Corporation. In a manifest attempt to protect the American Potato Market in which this price support program was operating from an influx of Canadian grown potatoes, the Acting Secretary of State of the United States, on November 23, 1948, entered into an executive agreement with the Canadian Ambassador, who was acting for the Canadian Government, to the effect that the Canadian Government would place potatoes in the list of commodities for which export permits were required and that export permits would be granted therefor only to Canadian exporters who could give evidence that they had firm orders from legitimate United States users of Canadian seed potatoes and that "Canadian exporters would also be required to have included in any contract into which they might enter with a United States seed potato importer a clause in which the importer would give an assurance that the potatoes would not be diverted or reconsigned for table stock purposes". In consideration of this agreement on the part of the Canadian Government, the United States Government undertook that it would not impose "any quantitative limitations or fees on Canadian potatoes of the 1948 crop exported to the United States" under the system of regulating the movement of potatoes to the United States outlined in the Canadian proposal and would not consider the Canadian Government's guarantee of a floor price with respect to certain potatoes to be the payment of a bounty or grant and would not levy any countervailing duty on such potatoes under the provisions of section 303 of the Tariff Act of 1930. On November 26, 1948, the Canadian Privy Council added potatoes to the list of products under export permit control and exporters of seed potatoes to the United States could not secure an export permit without complying with the conditions required by the executive agreement.

Defendant, a corporation engaged in business in Norfolk, Virginia, entered into a contract in December 1948 with H. B. Willis, Inc., a Canadian exporter, to purchase 48,544 sacks of Canadian seed potatoes, containing 100 lbs. each, to be shipped on the S. S. Empire Gangway docking in Jacksonville, Florida, in January 1949. Defendant's officers admittedly knew of the agreement with Canada and stated in a telegram to an official of the United States Department of Agriculture that the potatoes were being brought in for seed purposes. Defendant sent a telegram to the exporter in Canada on the same day that the potatoes were billed stating that they were for planting in Florida and Georgia. Defendant sold the potatoes while in shipment to the Atlantic Commission Company, a wholly owned agency of Great Atlantic & Pacific Tea Company, a retail grocery organization. No attempt was made to re-

strict their sale so that they would be used for seed and not for food, and there is evidence from which the jury could properly have drawn the conclusion that they were sold on the market as food displacing potatoes grown in this country and causing damage to the United States by requiring greater purchases of American grown potatoes in aid of the price support program than would have been necessary in the absence of their importation.

On these facts we think that judgment was properly entered for the defendant, but for reasons other than those given by the District Court. We have little difficulty in seeing in the evidence breach of contract on the part of defendant and damage resulting to the United States from the breach. We think, however, that the executive agreement was void because it was not authorized by Congress and contravened provisions of a statute dealing with the very matter to which it related and that the contract relied on, which was based on the executive agreement, was unenforceable in the courts of the United States for like reason. We think, also, that no action can be maintained by the government to recover damages on account of what is essentially a breach of a trade regulation, in the absence of express authorization by Congress. The power to regulate foreign commerce is vested in Congress, not in the executive or the courts; and the executive may not exercise the power by entering into executive agreements and suing in the courts for damages resulting from breaches of contracts made on the basis of such agreements.

In the Agricultural Act of 1948, Congress had legislated specifically with respect to the limitations which might be imposed on imports if it was thought that they would render ineffective or materially interfere with any program or operation undertaken pursuant to that act. Section 3 of the act, which amended prior statutes, provided in the portion here pertinent, 62 Stat. 1248–1250, 7 U.S.C.A. § 624:

"(a) Whenever the President has reason to believe that any article or articles are being or are practically certain to be imported into the United States under such conditions and in such quantities as to render or tend to render ineffective, or materially interfere with, any program or operation undertaken under this title * * * he shall cause an immediate investigation to be made by the United States Tariff Commission, which shall give precedence to investigations under this section to determine such facts. Such investigation shall be made after due notice and opportunity for hearing to interested parties, and shall be conducted subject to such regulations as the President shall specify.

"(b) If, on the basis of such investigation and report to him of findings and recommendations made in connection therewith, the President finds the existence of such facts, he shall by proclamation impose such * * * quantitative limitations on any article or articles which may be entered * * * for consumption as he finds and declares shown by such investigation to be necessary in order that the entry of such article or articles will not render or tend to render ineffective, or materially interfere with, any program or operation referred to in subsection (a), of this section * * * *Provided,* That no proclamation under this section shall impose any limitation on the total quantity of any article or articles which may be entered * * * for consumption which reduces such permissible total quantity to proportionately less than 50 per centum of the total quantity of such article or articles which was entered * * * for consumption during a representative period as determined by the President: * * * *."

There was no pretense of complying with the requirements of this statute. The President did not cause an investigation to be made by the Tariff Commission, the Commission did not conduct an investigation or make findings or recommendations, and the President made no findings of fact and issued no proclamation imposing quantitative limitations and determined

no representative period for the application of the 50% limitation contained in the proviso. All that occurred in the making of this executive agreement, the effect of which was to exclude entirely a food product of a foreign country from importation into the United States, was an exchange of correspondence between the Acting Secretary of State and the Canadian Ambassador. Since the purpose of the agreement as well as its effect was to bar imports which would interfere with the Agricultural Adjustment program, it was necessary that the provisions of this statute be complied with and an executive agreement excluding such imports which failed to comply with it was void. Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 999, 82 L.Ed. 1129; Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 253, 79 L.Ed. 446. As was said by Chief Justice Hughes in the case last cited: "We are not dealing with action which, appropriately belonging to the executive province, is not the subject of judicial review or with the presumptions attaching to executive action. * * * we are concerned with the question of the delegation of legislative power. * * *"

■ It is argued, however, that the validity of the executive agreement was not dependent upon the Act of Congress but was made pursuant to the inherent powers of the President under the Constitution. The answer is that while the President has certain inherent powers under the Constitution such as the power pertaining to his position as Commander in Chief of Army and Navy and the power necessary to see that the laws are faithfully executed, the power to regulate interstate and foreign commerce is not among the powers incident to the Presidential office, but is expressly vested by the Constitution in the Congress. It cannot be upheld as an exercise of the power to see that the laws are faithfully executed, for, as said by Mr. Justice Holmes in his dissenting opinion in Myers v. United States, 272 U.S. 52, 177, 47 S.Ct. 21, 85, 71 L.Ed. 160, "The duty of the President to see that the laws be executed is a duty that does not go beyond the laws or require him to achieve more than Congress sees fit to leave within his power".

In the recent case of Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 867, 96 L.Ed. 1153, the Supreme Court dealt with the question in the following pertinent language:

"Nor can the seizure order be sustained because of the several constitutional provisions that grant executive power to the President. In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad. And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute. The first section of the first article says that 'All legislative Powers herein granted shall be vested in a Congress of the United States * * *.' After granting many powers to the Congress, Article I goes on to provide that Congress may 'make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.' "

The rule was well stated by Mr. Justice Jackson in his concurring opinion in the case last cited as follows:

"When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system."

■ We think that whatever the power of the executive with respect to making

executive trade agreements regulating foreign commerce in the absence of action by Congress, it is clear that the executive may not through entering into such an agreement avoid complying with a regulation prescribed by Congress. Imports from a foreign country are foreign commerce subject to regulation, so far as this country is concerned, by Congress alone. The executive may not by-pass congressional limitations regulating such commerce by entering into an agreement with the foreign country that the regulation be exercised by that country through its control over exports. Even though the regulation prescribed by the executive agreement be more desirable than that prescribed by Congressional action, it is the latter which must be accepted as the expression of national policy.

■ It is argued that irrespective of the validity of the executive agreement, the contract sued on was a valid contract between defendant and the Canadian exporter and that since the contract was made for the benefit of the United States, this country may maintain action upon it.* The answer is that the contract was but the carrying out of the executive agreement entered into in contravention of the policy declared by Congress; and the courts of the United States will not lend their aid to enforcing it against the public policy of the country so declared. As stated, the regulation of imports from foreign countries is a matter for Congress and, when Congress has acted, the executive may not enforce different regulations by suing on contracts made with reference thereto. As said by the Supreme Court in Oscanyan v. Arms. Co., 103 U.S. 261, 277, 26 L.Ed. 539, "Contracts permissible by other countries are not enforceable in our courts, if they contravene our laws, our morality or our policy."

■ We think the action for damages may not be sustained for the additional reason that Congress has created no such right of action and we think that the principles laid down by the Supreme Court in United States v. Standard Oil Co. of California, 332 U.S. 301, 67 S.Ct. 1604, 91 L. Ed. 2067, are applicable here. This is not a case where the government stands in the shoes of a private person and sues on a contract which it has made as such. It is a case where the government sues in its sovereign capacity to recover damages which it claims to have sustained while engaged in the exercise of governmental powers, as the result of the violation of a contract made between other persons. No such cause of action exists under federal law; and we do not think that analogies drawn from private contract law, permitting suit by one for whose benefit a contract is made to sue thereon, can properly be followed here. "The exercise of judicial power to establish a new liability would amount to an unwarranted intrusion by the courts into a field properly within the control of Congress and as to a matter concerning which it had seen fit to take no action". Gartner v. United States, 9 Cir., 166 F.2d 728, 730. In the case of United States v. Standard Oil Co. of California, supra, the Supreme Court, in denying recovery by the government in an action grounded in analogies to private tort law, used the following language which we think pertinent, viz.:

"Moreover, as the Government recognizes for one phase of the argument but ignores for the other, we have not here simply a question of creating a new liability in the nature of a tort. For grounded though the argument is in analogies drawn from that field, the issue comes down in final consequence to a question of federal fiscal policy, coupled with considerations concerning the need for and the appropriateness of means to be used in executing the policy sought to be established. The tort law analogy is brought forth, indeed, not to secure a new step forward in expanding the recognized area for applying settled principles of that law as such, or for

* There is a holding to that effect in a decision of the United States District Court for the Eastern District of New York in the case of United States v. Carpenter, 113 F.Supp. 327.

creating new ones. It is advanced rather as the instrument for determining and establishing the federal fiscal and regulatory policies which the Government's executive arm thinks should prevail in a situation not covered by traditionally established liabilities.

"Whatever the merits of the policy, its conversion into law is a proper subject for congressional action, not for any creative power of ours. Congress not this Court or the other federal courts, is the custodian of the national purse. By the same token it is the primary and most often the exclusive arbiter of federal fiscal affairs. And these comprehend, as we have said, securing the treasury or the government against financial losses however inflicted, including requiring reimbursement for injuries creating them, as well as filling the treasury itself." [332 U.S. 301, 67 S.Ct. 1611.]

For the reasons stated, we do not think that the United States can maintain the action for damages. The judgment for defendant will accordingly be affirmed.

Affirmed.