**DISTRICT OF COLUMBIA, Appellant,**

**v.**

**In the Matter of H. J. B., Appellee.**

**U. S. CATHOLIC COMMITTEE FOR REFU-
GEES AND MIGRATION, Appellant,**

**v.**

**In the Matter of H. J. B., Appellee.**

**Nos. 9684 and 9743.**

District of Columbia Court of Appeals.

Argued Nov. 5, 1975.

Decided June 9, 1976.

James N. Dulcan, Asst. Corp. Counsel, Washington, D. C., with whom C. Francis Murphy, Corp. Counsel, Washington, D. C., at the time the brief was filed, Louis P. Robbins, Principal Asst. Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the brief, for the District of Columbia.

Alfred L. Scanlan, Washington, D. C., with whom Franklin D. Kramer and R. James Woolsey, Washington, D. C., were on the brief, for appellant United States Catholic Committee for Refugees, NCWC.

Patrick J. Christmas, Washington D. C., also entered an appearance.

Elizabeth J. Branda and Joel Klein, Washington, D. C., with whom W. Anthony Fitch, Harry J. Fulton and Frederick H. Weisberg, Public Defender Service, and Patricia Wald, Washington, D. C., Mental Health Law Project, were on the brief, for appellee.

Judith C. Areen, Washington, D. C., with whom Wallace J. Mlyniec, Georgetown Juvenile Justice Clinic, Washington, D. C., submitted a brief as amicus curiae on behalf of American Ortho Psychiatric Association, Child Welfare League, National Society for Autistic Children and Washington Psychiatric Society.

Before REILLY, Chief Judge, and YEAGLEY and MACK, Associate Judges.

YEAGLEY, Judge:

The difficult issues raised on this appeal arise out of an order entered June 3, 1975, in which the trial court directed that the appellee be transferred from St. Elizabeths Hospital to Emma Pendleton Bradley Hospital in Meridian, Rhode Island. Appellants, the District of Columbia and the United States Catholic Committee on Refugees and Migration, were ordered to bear the costs of that placement, approximately $29,000 per year. After review of the numerous arguments raised by the parties and the brief filed by the amici, we reverse as to the liability of the Committee, affirm the government's liability for the appellee's medical expenses and remand in order that the government may propose a program of medical and psychiatric care suitable for appellee's treatment during the term of her involuntary commitment.

The Catholic Committee is a District of Columbia organization incorporated in 1954. The Committee's principal activity consists in the placement of foreign-born children with American families. During the years it has been in existence, the Committee has found homes for a great many orphans including the appellee. Although separately incorporated, the Committee is a constituent agency of the United States Catholic Conference which is the Committee's prime source of revenue.

Appellee H.J.B. is a 14-year-old female diagnosed as severely retarded with a major psychiatric disorder and autistic tendencies. She is presently confined to the care of St. Elizabeths as the result of a petition for involuntary commitment filed by the Superintendent of that hospital with the Mental Health Commission in July 1974, which petition subsequently was filed with the Superior Court.

Appellee was born in late September 1961 and was found abandoned shortly after her birth in the streets of Pusan, Korea. Thereafter she was entrusted to the care of a Catholic orphanage. The orphanage contacted the Committee which arranged for her adoption by an American family in Illinois.

The child was certified in good health by the United States Health Service in Korea and brought to the United States in May 1963. Soon after her arrival in Illinois, the family discovered that the child was not developing normally and in 1966, refused to continue with the adoption. The local agency of the Catholic Charities of Illinois assumed custody. For the next seven years, the child was moved from one foster home or institution to another but each placement failed, generally because of the violent behavior to which the child was then, and is now, prone.

In the spring of 1974, the child was brought to the Committee's New York office and placed in Bellevue Hospital. Bellevue treated her for some months, but refused to continue her treatment beyond that period because she was not, in the hospital's opinion, a bona fide resident of New York. The child was returned to the Committee on June 27, 1974. That same day, she was flown to the Committee's national headquarters in Washington. A physician in the company of an official of the Washington office examined the child immediately upon her arrival at National Airport, and after diagnosing her condition as "chronic undifferentiated schizophrenia", signed the necessary commitment papers. Within two hours of landing, the child was admitted as an emergency patient at St. Elizabeths Hospital.

One week later, the Superintendent of the hospital filed a petition for involuntary commitment, pursuant to D.C.Code 1973, § 21–541. Proceedings before the Mental Health Commission concluded in a recommendation to the Superior Court that H.J.B. be ordered to a period of indefinite hospitalization in St. Elizabeths. The Commission found, in support of its recommendation, that H.J.B. was a resident of the District of Columbia and that she was mentally ill and a danger to herself.

The Superior Court adopted the mental illness finding at its initial hearing, held November 22, 1974, but as there was evidence taken in the court and before the Commission to indicate that the child could not receive adequate care at St. Elizabeths, the proceeding was continued to explore alternative courses of providing for her maintenance. Upon a suggestion made at a hearing held December 16, 1974, the court ordered the child placed with the National Children's Center, but was compelled to reconsider the matter on April 22, 1975, because the Center refused to accept the child even on a nonresidential basis. During the ensuing period, appellee's attorneys discovered the possibility of placing her at the Bradley Hospital which has a special program for the treatment of such cases. The hospital indicated it would accept the child for a minimum one-year placement at a charge of $79 per day or approximately $29,000 per annum. The court considered the suggestion at a hearing held April 23, 1975, and as there was no other proposal for H.J.B.'s care, ordered on May 7, 1975, that the child be transferred to Bradley, directing further that the District of Columbia bear the cost of her expenses. The latter part of the order was modified later. In support of its order, the court found, *inter alia,* that H.J.B. was a legal resident of the District, that she had unique treatment needs, that she could not be adequately cared for at St. Elizabeths and that there were no other suitable alternatives for her care at that time other than the Bradley placement.

Up to this point only the appellee and the United States, on behalf of the hospital,[1] had been represented by counsel at the hearings, although employees of both the District and the Committee had appeared previously as witnesses. The District, after receiving the May 7th order, filed a motion to intervene. The motion was granted and the hearing reopened so that the District could present witnesses to contest the residency finding, an effort which ultimately proved unsuccessful.

During the hearings which followed the District's motion to intervene, a question was raised concerning the possible liability of the Committee for H.J.B's medical expenses. Two theories were advanced in support of that proposition. The first suggested that as the Committee had acted as the child's guardian and had brought the child to the District, it could not declare her a public charge and disavow responsibility for her support. The second was premised on the Committee's corporate charter, filed in the District, in which the Committee had stated among its corporate objects and purposes:

> To the extent and in the manner permitted by applicable law to accept the custody and control, formal or otherwise, by surrender, commitment, relinquishment, release, or otherwise, of any of the foregoing individuals [children brought by the Committee to this country for adoption] who may be minors and to place such minors . . . in boarding homes, foster homes, or custodial homes; to support them until they reach majority or are adopted; to act as guardian of their persons or property or both; and to give consent to their legal guardianship or adoption . . .

> To do any and all acts, and to render any and all services or assistance which may prevent such individuals from becoming public charges in communities of the United States . . . .

At the May 23rd hearing, the first at which the Committee's liability was considered, the court declined to rule on the question pending advice from the Committee concerning its willingness to voluntarily guarantee payment of H.J.B's expenses. The Committee later responded that because its annual budget was only $42,000 it

---

1. St. Elizabeths Hospital is a federal facility and its Superintendent a federal official. *See* 24 U.S.C. § 161, *et seq.* (1970).

could not afford the $29,000 annually needed to care for the one child at Bradley without seriously curtailing the Committee's other philanthropic activities involving many other persons. The court expressed its belief that the Committee could not elude the promise it had made in its articles of incorporation and suggested that the Committee would have to seek additional funds from its parent organization. The Committee's request for time to investigate less expensive arrangements for H. J.B.'s care was denied.

The following day, the court again ordered H.J.B. transferred to Bradley but modified its earlier order by directing that her expenses be borne jointly and severally by the District and the Committee. The court found, with respect to the Committee, that it had functioned as the child's guardian, being responsible for the child's care as mandated by its articles of incorporation. With respect to the District, the court found H.J.B. a District resident, ruling that she had acquired that residency by virtue of her relationship with the Committee. Timely appeals by both the District and the Committee were filed, and this court granted a motion by the Committee to stay execution of the order pending appeal.

D.C.Code 1973, § 3–110 provides that the District of Columbia Board of Charities shall, among its other duties, "afford hospital care for indigent insane persons who are legal residents of the District of Columbia in such hospital or hospitals as are or may be designated by law". The District disclaims all responsibility for H.J.B.'s care on the ground that she is not a bona fide resident of this jurisdiction.

■ "Residence" is not a term of fixed legal definition but takes on shades of meaning according to the context in which it is found. *Kristensen v. McGrath*, 86 U.S.App.D.C. 48, 53, 179 F.2d 796, 801 (1949), *aff'd,* 340 U.S. 162, 71 S.Ct. 224, 95 L.Ed. 173 (1950). The sole reference to

residency within the involuntary commitment chapter of the Code is that found in D.C.Code 1973, § 21–551, which provides that a person committed to a public hospital but found not to be a resident of the District of Columbia be transferred to his state of residence, if an appropriate institution within that state be found willing to accept him. A "resident of the District of Columbia" is defined for purposes of that section as "a person who has maintained his principal place of abode in the District of Columbia for more than one year immediately prior to the filing of the [commitment] petition." Section 21–551 was declared unconstitutional in *Jemison v. Robinson*, Civil No. 927–70 (D.D.C. filed Oct. 19, 1970). The mettle of that decision was subsequently established by the Supreme Court in *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L. Ed.2d 306 (1974), where the Court reviewed the constitutionality of an Arizona statute requiring a year's residence in a county as a condition to an indigent's receiving nonemergency hospitalization. The Supreme Court ruled the statute unconstitutional, holding that a state could not set a one-year residential prerequisite to public assistance for medical care without violating the rights of one whose residence in Arizona was less than one year under the Equal Protection Clause of the Fourteenth Amendment.

■ Although the Fourteenth Amendment is not applicable to the District of Columbia, *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), a similar protection is found in the Due Process Clause of the Fifth Amendment. *Washington v. United States*, 130 U.S.App.D.C. 374, 381, 401 F.2d 915, 922 (1968). We agree with the opinion expressed in *Jemison* that an attempt to draw upon § 21–551 as a bar to the claim of newly-arrived residents for public medical assistance would, in light of *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), be so unjustifiably discriminatory as to

constitute a violation of the Fifth Amendment right to due process.[2]

Only the "waiting periods" at issue in the *Memorial Hospital* and *Shapiro* cases were ruled unconstitutional. *See Memorial Hospital v. Maricopa County, supra,* 415 U.S. at 255, 267, 94 S.Ct. 1076; *Shapiro v. Thompson, supra,* 394 U.S. at 636, 89 S.Ct. 1322. The extent to which a state or the District of Columbia may discriminate between indigent residents and indigent nonresidents in providing medical assistance at public expense has not been specifically addressed by the courts. We need not address that issue here for we concur in the trial court's finding that appellee is a bona fide resident of the District.

 Insofar as "residence" was at issue in determining appellee's ability to claim medical care from the District government, the matter to be decided was whether in light of all available indicia of residence,[3] independent of her confinement at St. Elizabeths, appellee's presence in the District could properly be accounted for as the product of something more than a "temporary sojourn." *Fink v. Katz,* D.C.Mun. App., 68 A.2d 813, 815 (1949); *D'Elia & Marks Co. v. Lyon,* D.C.Mun.App., 31 A.2d 647, 648 (1943).

The burden on the residence issue was with the government, *District of Columbia v. Stackhouse,* 99 U.S.App.D.C. 242, 239 F.2d 62, 65 (1956), and on the evidence available it was unable to carry that burden. We are concerned here only with the appellee's status at the time of and following her arrival in the District. On the unique facts we review, including the fact that her custodian was a District of Columbia corporation, regardless of whatever claim to residence in this or another jurisdiction H.J.B. may have possessed prior to landing at National Airport, once she was placed directly in the custody of officials operating from the Committee's Washington office she acquired a colorable claim to a District of Columbia residence, which, if not disproven, would entitle her to claim the benefit of whatever rights to public medical assistance are allowed District residents by law. No evidence was offered to suggest that the transfer of H.J.B. from the Committee's New York office to its national headquarters was intended as anything less than an indefinite arrangement for her care. Nor did the details of her unfortunate history establish that there was some residue of permanent attachment to a jurisdiction other than the District still remaining after her remarkable but tragic journey from Korea to St. Elizabeths. We find no error, therefore, in the trial court's residency determination and affirm the District of Columbia's liability for appellee's care.[4]

We find the case of *In re Afflick,* 10 D.C. (3 MacArth.) 95 (1879), relied on by appellant to be inapposite. The question there was the domicile of a child who had died here intestate. The court ruled that since the person who brought the child to the District had not been appointed guardian until after the child's arrival here that the child's domicile remained that of his deceased parents in Tennessee.

 In considering the question raised by the Committee's appeal, we are concerned only with its liability for the appellee's medical expenses during the term of her commitment. The District is initially charged with the maintenance and treatment of persons involuntarily confined to a

---

2. D.C.Code 1973, § 32–405 provides: "All indigent insane persons residing in the District of Columbia *at the time they become insane* shall be entitled to the benefits of Saint Elizabeths Hospital. . . . " (Emphasis supplied.) To the extent that this provision could be construed as a bar to the claim of a newly-arrived resident for public medical assistance, it too would be invalid for this reason.

3. *Ruoff v. Brownell,* 14 F.R.D. 371 (D.D.C. 1953).

4. *See also* Article III, Interstate Compact on Mental Health, D.C.Code 1973, § 6–1601.

public hospital for the mentally ill, but may seek reimbursement for its outlay on behalf of the patient pursuant to D.C.Code 1973, § 21–586, which provides:

> (a) The father, mother, husband, wife, and adult children of a mentally ill person, if of sufficient ability, and the estate of the mentally ill person, if the estate is sufficient for the purpose, shall pay the cost to the District of Columbia of the mentally ill person's maintenance, including treatment, in a hospital in which the person is hospitalized under this chapter. . . .

At common law, the maintenance of the mentally ill by the public created no obligation upon private parties. *Baker v. District of Columbia*, 39 App.D.C. 42, 53 (1912). The District's right to reimbursement consequently arises solely by statute and will extend no further than to permit those claims for recompense which are either specifically set out in the enabling provision or are fairly inferrable from its language in the natural course of interpretation.[5]

 Neither the present statute nor its predecessors [6] have placed a direct obligation of support upon those parties bearing a custodial as opposed to familial relation to the mentally ill patient. To the contrary, the immediate predecessor of §

21–586 specifically addressed the liability of a party acting as the guardian of either the patient's person or estate and therein provided:

> The father, mother, husband, wife, and adult children of an insane person, if of sufficient ability, and the committee or *guardian of his or her person and estate, if his or her estate is sufficient for the purpose*, shall pay the cost to the District of Columbia of his or her maintenance, including treatment . . . . [52 Stat. 625, 630 (emphasis added).]

The present statute omits the reference to "guardians" but leaves the schedule of sources from which the District may seek repayment essentially unchanged.[7] Thus, even if it be allowed that the relationship between the Committee and the appellee was that of a traditional guardian and ward, the Committee's obligation would be limited to providing for the application of her estate in satisfaction of the District's demand for reimbursement but, of course, she is penniless.[8] Appellee's custody fell to the Committee by default upon the collapse of the Illinois adoption. Custody has been maintained due to the Committee's inability to locate a permanent arrangement for the appellee's care because of her severe infirmity.[9] The Committee has not, in short, sought its long term association with the child but has had the relationship

---

5. *Baker v. District of Columbia, supra* at 53; *Gartner v. United States*, 166 F.2d 728 (9th Cir. 1948); *Humboldt County v. Biegger*, 232 Iowa 494, 4 N.W.2d 422 (1942); *In re Hessney's Will*, 177 Misc. 781, 31 N.Y.S.2d 980 (Ontario Sur.Ct.1941); *State v. Morris*, 303 S.W.2d 802 (Tex.Civ.App.1957).

6. *See* R.S. 4849 (1861); 33 Stat. 740 (1905); 52 Stat. 625 (1938).

7. Such was apparently Congress' intent. *See* H.R.Rep.No.1833, 88th Cong., 2d Sess. 14 (1964); S.Rep.No.925, 88th Cong., 2d Sess. 19 (1964).

8. The grant to a "child placing agency" of parental rights, as opposed to parental duties, by D.C.Code 1973, § 32–786 is primarily for

the purpose of vesting the agency with the authority to consent to the child's adoption. It does not of its own force expand the scheddule of liabilities set out in § 21–586, at least on such facts as those present here where the party acting as the agent for the child's placement has acquired its more recent custodial relation by default of an adoption proceeding outside the District of Columbia and has been unable to find an alternative placement for the child because of a disability unknown at the time the child was released to the preadoptive family.

9. The Committee has attempted to return the child to her homeland but has been unable to obtain the acquiescence of the Korean government in a document for reentry.

settle upon it as the child's custodian of last resort.[10]

■ With respect to the argument based on the portion of the Committee's articles of incorporation set out earlier in this opinion, it is noted that they merely set forth the objects and purposes for which the corporation was formed. They do not of themselves create a parental relation between the Committee and those children which later come into its care, nor create such third party rights as the government now attempts to assert.[11]

Remaining for our consideration is the dispositional portion of the trial court's order. Appellee's severe disability presently leaves her an adolescent of violent disposition unable to function intellectually beyond the capacity of a child between the ages of two and three and incapable, among other things, of speaking except at the most primitive level.

Appellee, being a person who is involuntarily confined to a public hospital for the mentally ill in the District of Columbia, is expressly granted by D.C.Code 1973, § 21–562 the right to "medical and psychiatric care and treatment." In a case where a patient committed to St. Elizabeths suffered from chronic brain syndrome associated with aging who was not considered dangerous to herself or others, the Circuit held on an appeal of a habeas corpus petition that the state bore the burden of exploring possible alternatives to her present confinement since a nursing home or other supervisory institution could suffice in her case. The court said: "Though she cannot be given such care as only the wealthy can afford, an earnest effort should be made to review and exhaust available resources of the community in order to provide care reasonably suited to her needs." *Lake v. Cameron*, 124 U.S.App.D.C. 264, 267, 364 F.2d 657, 660 (1966) (en banc) (footnote omitted).

The following year in applying the right conferred by this section to one confined at St. Elizabeths after being found not guilty by reason of insanity, the court said:

The hospital need not show that the treatment will cure or improve him but only that there is a bona fide effort to do so. This requires the hospital to show that initial and periodic inquiries are made into the needs and conditions of the patient with a view to providing suitable treatment for him, and that the program provided is suited to his particular needs. . . .

The effort should be to provide treatment which is adequate in light of present knowledge. Some measures which have therapeutic value for the particular patient may be too insubstantial in comparison with what is available. On the other hand, the possibility of bet-

---

10. For this reason we find the argument that the doctrine of equitable estoppel will supply a claim for reimbursement against the Committee to be without merit. *See Fuller v. Fuller*, D.C.App., 247 A.2d 767 (1968), *petition for review denied*, 135 U.S.App.D.C. 353, 418 F.2d 1189 (1969). We note in this respect that the Committee has not been a penurious provider during the course of its service as the child's custodian but in the period separating her rejection by the preadoptive family and her residence at St. Elizabeths Hospital has expended for her care between $70,000 and $100,000.

We also find without merit the attempt to establish liability upon the Committee by reference to the child neglect statutes, D.C. Code 1973, § 16–2301 *et seq*. Placing aside the fact that the proceeding now reviewed was not brought under the authority of that portion of the Code, § 16–2315 provides that if the child be found incompetent to proceed because of mental illness, the trial court shall suspend the neglect proceeding, upon which supension the Corporation Counsel may initiate an action for civil commitment. Section 21–586 becomes operative upon initiation of the commitment proceeding and, as we have held, that section does not provide a claim for reimbursement against the Committee.

11. *See* D.C.Code 1973, § 29–201 *et seq.*; 18 C.J.S. *Corporations* § 71 (1939); 7 W. Fletcher, Private Corporations § 3664 (1964 rev. vol.).

ter treatment does not necessarily prove that the one provided is unsuitable or inadequate.

. . . . . .

Continuing failure to provide suitable and adequate treatment cannot be justified by lack of staff or facilities. . . . [*Rouse v. Cameron,* 125 U.S. App.D.C. 366, 371–72, 373 F.2d 451, 456–57 (1967) (footnotes omitted).]

All parties agree that the present program of treatment is inadequate by this standard. St. Elizabeths, so far as the record indicates, has neither staff trained in pediatric psychiatry nor regular facilities for the care of autistic children and consequently has been unable to provide properly for appellee's care. She has been placed in a ward with elderly female retardees where she is administered regular doses of sedative medication. Citing the hospital's lack of facilities, appellee's attending physician, a clinical director at the hospital, testified that St. Elizabeths was an inappropriate environment for treating the appellee and that the hospital could not provide indefinitely for her maintenance.

Whether the trial court may, without the District of Columbia's consent, order a patient removed from this jurisdiction at the public expense to a better suited private hospital [12] is a question of first impression in this jurisdiction. The Code does not expressly grant such authority and in *Lake v. Cameron, supra,* the Circuit ordered the government "to review and exhaust available resources of the community". Since the Code provides no express answer and considering the important matters of policy which are at issue here together with the difficulty of ameliorating the myriad, often confusing legislative expressions found in the Code concerning the care of the mentally ill, we believe an attempted solution on the record before us would be improvident and premature.

■ Even assuming for purposes of discussion that where no reasonable program of treatment is available in the community the trial court may have power over the objection of the District government [13] to order the patient treated outside the jurisdiction, it should refrain from the exercise of that power until the District is given formal notice of the apparent inadequacy of local treatment and facilities and allowed ample opportunity to design a program of alternate local care utilizing the full wealth of facilities and services which are available to it within the jurisdiction. *Cf. Rouse v. Cameron, supra* at 373, 373 F.2d at 458. That opportunity has not yet been had. Although

12. *See Lake v. Cameron, supra* at 267, 364 F.2d at 660.

13. Section 21–545 provides that if upon hearing a petition for commitment the court should find that the patient is mentally ill and because of that illness is likely to injure himself or others should he be allowed to remain at liberty, it may order him hospitalized for an indefinite period, or may "order any other alternative course of treatment which the court believes will be in the best interest of the person or of the public." Other sections seem to contemplate local confinement. Section 21–549 grants the patient the right to petition for habeas corpus. Section 21–562 after its grant of entitlement to medical and psychiatric care and treatment to one confined in a public hospital, requires the hospital to keep records detailing the care and treatment received which shall be available on his order to his attorney and physician. Section 21–548 provides that one admitted pursuant to this subchapter shall be caused, by the chief of service of the hospital, to be examined not less often than every six months and that the chief of service shall release the patient if the conditions which caused his involuntary hospitalization no longer exist. These provisions could not be enforced beyond the trial court's jurisdiction and would seem to contemplate hospitalization locally. Indeed both "public hospital" and "private hospital" are defined for purposes of the commitment chapter of the Code as institutions located within the District of Columbia. Section 21–501. Whether the trial court may nonetheless order a patient outside the District of Columbia if all local facilities are found unsuitable for the patient's treatment is a question we leave open for future disposition.

District employees were called to testify earlier, the District of Columbia was not represented by counsel prior to filing its motion to intervene after it received the order of May 7, 1975, ordering it to provide for appellee's care at the Rhode Island facility. We note that the District upon entering the proceeding directed its attack primarily at the court's residency finding. We note also, that the court rejected overtures by both the District and the Committee for additional time in which to find an alternative arrangement for appellee's treatment. It is of course clear that the trial court, with the aid of the parties and representatives of District agencies, did devote substantial time to consideration of alternative placements, and that H.J.B. has had to remain at St. Elizabeths pending the outcome of these appeals.

The public's as well as the patient's interest must be examined. D.C.Code 1973, § 21–545. The public interest requires that a request for the commitment of an inordinate amount of public funds to the treatment of a single patient be accorded the closest administrative and judicial scrutiny and calls for a search for an acceptable alternative if we are to preserve the right to suitable treatment for the great majority of mentally ill whose needs may be of equal importance but much less costly. The strain upon the ability of this and other cities to supply services for those whose circumstances force them to seek public assistance is a problem of sizeable and unsettling proportions. Taking into account the considerable share of the District's funds appropriated for the mentally ill that would have to be committed so that this one patient may be treated at the Bradley facility, we are compelled to remand the case so that the District may be permitted the full opportunity to propose a program of care which may be reasonably suited to appellee's need for treatment in light of the District's capability and the overall demands of the many other mentally ill that the District may justifiably be called upon

to meet. The District also shall make such argument as it deems appropriate regarding the authority of the court to order out of state treatment at its expense, over its objection.

In view of the ramifications for H.J.B. of continued delays, we think it not unfair to place a time limit on the government. The District of Columbia shall have sixty days to present its proposal to the trial court.

*Affirmed in part, reversed in part, and remanded for proceedings not inconsistent with this opinion.*