Charles G. WOODARD A/K/A Woody
Woodard, Appellant,

v.

UNITED STATES, Appellee.

No. 84-236.

District of Columbia Court of Appeals.

Argued Oct. 26, 1988.
Decided Dec. 16, 1988.

Barbara E. Sosnick, appointed by this court, for appellant.

Kathyrn A. Myerscough, Asst. U.S. Atty., with whom Timothy J. Reardon, III, Principal Asst. U.S. Atty., Michael W. Farrell, and Elizabeth Trosman, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before MACK and SCHWELB, Associate Judges, and GALLAGHER, Senior Judge.

I

SCHWELB, Associate Judge:

In the afternoon of November 1, 1973, appellant Charles G. Woodard entered a home in Washington, D.C. and brutally murdered an elderly couple, their daughter, and her two year old son. The two older victims were stabbed repeatedly with kitchen knives, strangled with a telephone cord, bludgeoned with a hammer, and shot through the head. Their daughter and grandchild were strangled to death.

On the evening of the same day, police brought Woodard, who was not then a suspect in the murders, to St. Elizabeth's Hospital (the hospital) as "John Doe" after neighbors complained that he had been disturbing the peace and had pointed a gun at someone. Woodard's behavior at the hospital was bizarre. He assaulted a hospital employee and evidently attempted to strangle himself. He was diagnosed as suffering from a drug related psychosis resulting from intake of amphetamines. There were also indications of alcohol abuse.

A few days later, Woodard declined to take his medication but eloped from the hospital instead. He apparently remained at large for more than two months. On January 31, 1974, however, Woodard telephoned a radio disc jockey known as "Nighthawk." He told Nighthawk that he had been listening to his remarks about being good to one's brothers and sisters and wanted to speak with him. He then proceeded to the radio station and dramatically confessed to the murders on tape.

Following his confession, Woodard was arrested and eventually indicted on four counts of first degree murder and one count of carrying a pistol without a license. He was brought to trial, but a mistrial was declared after several days because he continuously acted in an erratic manner and obstructed rather than assisting his counsel. He was tried for a second time, and in May 1975, he was convicted on the weapons count but found not guilty by reason of insanity with respect to each of the murder charges. Woodard was committed to St. Elizabeth's Hospital, diagnosed as a para-

noid schizophrenic, and placed in a maximum security facility.

Woodard's condition improved at the hospital as he received treatment, but he has had his ups and downs. On at least two occasions between 1979 and 1982, he was placed in minimum security or conditionally released to attend a supervised adult education program. Each time, however, his psychotic delusions returned or his condition deteriorated in some other way, and more restrictive conditions were reimposed. On March 2, 1982, after Woodard's condition had improved in some measure, Judge Paul F. McArdle denied his motion for unconditional release but granted the hospital's motion to place him in minimum security status and to permit him to visit his mother in the community for eight hours each month.

In 1983, the hospital authorities being satisfied that Woodard's condition had improved substantially and that he could handle more responsibility, moved pursuant to D.C.Code § 24–301(e) (1981), for Woodard's conditional release to a full-time six-month vocational training program at the Diesel Institute. This program would have required Woodard to be away from the hospital nine hours a day, five days a week, including two hours of daily travel. Judge W. Byron Sorrell heard evidence with respect to this motion on March 8, 1983. Concerned whether Woodard was ready to handle such a program, the judge decided to withhold ruling pending the submission by his counsel of less stressful alternatives. Counsel presented no such alternatives and, on August 30, 1983, Judge Sorrell decided that Woodard's mental condition would have to be reviewed prior to resolution of the motion. The judge expressed concern that the burden of classes, travel, and homework would result in further psychotic episodes, and that more suitable and less ambitious proposals had not been presented to him.

Shortly thereafter Woodard, through his attorney, moved pursuant to § 24–301(k) for his conditional release to the six-month Diesel Institute course which was to begin in November 1983. After hearing further evidence on October 4, 1983, Judge Sorrell again observed that Woodard had not proposed any alternative vocational programs, even though a staff doctor had testified that part-time programs not associated with the Diesel Institute did exist. Judge Sorrell reiterated his concern that the Diesel Institute might be inappropriate for Woodard. He noted that Woodard's condition had deteriorated in the past, and that the intensive Diesel Institute schedule might prove too taxing. The judge then asked one of Woodard's witnesses whether the Diesel Institute would refund the public grant money if Woodard could not, as the judge feared, complete the program. The witness replied that he understood that under those circumstances the Institute would refund the grant money, approximately $3,800, but not the $200 or $300 charged to Woodard.

Judge Sorrell then granted Woodard's motion subject to several safeguards, none of which Woodard opposed. The judge ordered that a social worker should communicate weekly with the president of the Institute, that Woodard's visits to his mother should be discontinued until his adjustment at the Institute could be evaluated, that the hospital should file a progress report every ninety days, that the hospital was authorized to discontinue release if Woodard's condition deteriorated or if he failed to comply with the rules of the hospital, and that the hospital or Woodard should obtain a letter from the Institute stating that it would refund *pro rata* any of Woodard's fee if he proved to be unable to complete the intensive program. Judge Sorrell directed that an order reflecting these conditions should be signed by both parties. No such order was submitted, however, and no appeal was filed.

Woodard did not enroll in the course, which had commenced two months earlier, and the letter from the Institute was never obtained. On January 26, 1984, upon request of the government, the court denied the motion for conditional release without prejudice, because Woodard had failed to comply with the court's condition requiring assurance of a *pro rata* refund and because, more than two months after the

course had begun without him, the issue was moot. On February 6, 1984, Woodard filed a *pro se* notice of appeal from the January 26 order. Following unacceptable delays, largely attributable to difficulties in securing transcripts of various hearings, the case was argued on October 26, 1988, more than five years after Judge Sorrell imposed the condition of which Woodard now complains.

## II

D.C.Code § 24–301(e) provides in substance that where the court finds after a hearing that an acquittee who has been committed to a facility for the mentally ill has recovered his sanity and will not in the reasonable future be dangerous to himself or others, the court shall order his unconditional release. If the requirements for unconditional release have not been met, the superintendent of the facility may certify that the acquittee's condition warrants conditional release under supervision. If, after a hearing, the court finds that the acquittee's condition warrants conditional release, then the court shall order release "under such conditions as the court shall see fit."

Woodard contends on appeal that, in making his conditional "release" contingent upon the Diesel Institute's readiness to provide a *pro rata* refund of his tuition in the event that he failed to complete the course, the trial judge imposed a condition irrelevant to Woodard's dangerousness to himself or others, and was therefore improper. He relies on *United States v. Ecker,* 177 U.S.App.D.C. 31, 543 F.2d 178 (1976), *cert. denied,* 429 U.S. 1063, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977) and *DeVeau v. United States,* 483 A.2d 307 (D.C.1984). Woodard also claims that by imposing this condition, the trial judge denied him the right to receive treatment in the least restrictive setting consistent with his needs and the safety of the community. *Ecker, supra,* 177 U.S.App.D.C. at 52, 543 F.2d at 199. The government responds, in part, that the issue here is not conditional release in principle (to which Judge Sorrell agreed) but the suitability of a particular program, and that in resolving that issue the court may

consider economic factors as well as dangerousness. *See, e.g., District of Columbia v. H.J.B.,* 359 A.2d 285, 294–95 (D.C. 1976).

Although the question whether, and under what circumstances, conditional release may be denied on economic grounds is an important one, and merits resolution in a case in which it is fairly presented, we do not think it appropriate to address it here. No appeal was taken from Judge Sorrell's initial decision imposing the condition of which Woodard now complains. Indeed, Woodard voiced no objection to that condition in the trial court at any time. The record is silent as to whether any effort was made by Woodard to comply with that condition, or whether the imposition of the condition prejudiced him. It may well be that the contemplated assurance of a *pro rata* refund was available from the Diesel Institute upon request.

The order from which an appeal was taken was entered on January 26, 1984, more than two months after the six-month course in which Woodard was interested had begun. It was obviously too late, by that time, for Woodard to enroll. Under these circumstances, we conclude that, irrespective of the merits of the refund requirement, Judge Sorrell was correct in characterizing the issue of Woodard's participation in that session of the Institute as moot, and it was unnecessary to reach any other issues. Moreover, by specifying that his denial of Woodard's motion was without prejudice, and by repeatedly inviting the presentation of alternative proposals, Judge Sorrell demonstrated that he was ready to authorize conditional release in principle and that he had ruled adversely to Woodard only with respect to this particular program.

Moreover, the mootness in January 1984 of the question whether Woodard should be permitted to attend a course which began in November 1983 has been compounded by the excessive and unfortunate delay which has been encountered by this appeal. The course in question began more than five years ago. The record does not reveal

whether it still exists, whether Woodard remains interested in it, and whether his present condition is compatible with enrollment in it. Moreover, in light of what we have said about the program-specific character of Judge Sorrell's decision and Woodard's failure to contest it in the trial court, we do not think this is an appropriate case to invoke the doctrine of "capable of repetition but evading review." *Cf. In re Morris*, 482 A.2d 369, 371–72 (D.C.1984).

## III

For the foregoing reasons, the decision of the Superior Court is affirmed because, and only because, Judge Sorrell correctly held that the issue before him was moot. Our affirmance is without prejudice to Woodard's challenging, and to the government's defending, a similar economic condition if one should be imposed in the future.

AFFIRMED.

MACK, Associate Judge, concurring:

I concur in the judgment of this court on grounds of mootness. However, because I think constitutional and statutory considerations so clearly negate the government's position that conditional release may be denied on economic grounds, it is difficult for me to see that issue as an open one.

Nearly fifteen years ago a jury acquitted appellant of murder by reason of insanity. He was placed in St. Elizabeths Hospital for psychiatric care, with a view to his ultimate cure and release. As an acquit-

tee, however horrible the crime with which he was charged, he has a constitutional liberty interest.[1] The case law asserts compellingly that safety concerns are the only interests that can excuse restraints on an acquittee's liberty.[2] He has a right to treatment by the least restrictive means consistent with his own safety and that of the community.[3]

Preconditions to release that fail to address the safety of the acquittee and of society are constitutionally defective restraints on individual liberty. Legal inroads on personal liberty are justified only when they are the least restrictive means to a compelling state interest.[4] Where the state interest is the security of the individual or society, a legal restraint on liberty bottomed on fiscal concerns can hardly be the least restrictive means to those ends; indeed, it bears no rational relation to them. Requiring the guaranty of the receipt of a refund as a condition of release holds appellant hostage to financial considerations irrelevant to the circumstances of his commitment.

---

1. *See DeVeau v. United States*, 483 A.2d 307, 311 (D.C.1984) (court must balance interests of individual liberty and public safety); *In re Richardson*, 481 A.2d 473, 482 (D.C.1984) (citing liberty interest of criminal acquittee); *cf. Lake v. Cameron*, 124 U.S.App.D.C. 264, 267–69, 364 F.2d 657, 660–62 (1966) (en banc) (citing liberty interest of civil committee).

2. As the court held in *Covington v. Harris*, commitment "entails an extraordinary deprivation of liberty justifiable only when the respondent is 'mentally ill to the extent that he is likely to injure himself or others if allowed to remain at liberty.'" 136 U.S.App.D.C. 35, 41, 419 F.2d 617, 623 (1969) (citation omitted). Although the *Covington* court was commenting on civil commitment, a criminal acquittee also retains his constitutional liberty interest, and is therefore

entitled to treatment governed by the same fundamental principles.

3. *In re Richardson, supra* note 1, at 479, 480; *United States v. Ecker*, 177 U.S.App.D.C. 31, 52, 543 F.2d 178, 199 (1976), *cert. denied*, 429 U.S. 1063, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977).

4. *See, e.g., New York State Club Ass'n v. City of New York*, —— U.S. ——, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) (freedom of association); *Virginia v. American Booksellers Ass'n*, —— U.S. ——, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (freedom of publication); *Watseka v. Illinois Public Action Council*, 479 U.S. 1048, 107 S.Ct. 919, 93 L.Ed.2d 972 (1987) (freedom of speech); *Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972) (freedom of religion).