# Waiver of Claims for Damages Arising Out of Cooperative Space Activity

Congress has not authorized the National Aeronautics and Space Administration to waive subrogated claims on behalf of federal agencies against foreign States for damages arising out of cooperative space activity. An amendment to the Space Act would be necessary to grant NASA such authority.

The President may waive claims, including subrogated claims, against foreign governments, in exchange for a reciprocal waiver from the foreign government. The President may delegate this authority to an agency head.

The weight of authority supports the President's power to waive state claims against a foreign government.

June 7, 1995

MEMORANDUM OPINION FOR THE LEGAL ADVISER
DEPARTMENT OF STATE

This memorandum responds to your request for our opinion concerning a legal matter under discussion between the Department of State and the National Aeronautics and Space Administration ("NASA"). NASA has been negotiating executive agreements with Japan and certain other foreign States under which the United States and those States would agree to waive all claims, including subrogated claims, against the other for damages arising out of cooperative space activity. You have asked whether NASA is authorized to waive subrogated claims on behalf of other federal agencies, and if not, how a government-wide waiver could be implemented. In addition, you have asked whether the federal government may waive claims for damages to which state governments may be subrogated.

We have concluded that Congress has not authorized NASA to waive such claims on behalf of other federal agencies. An amendment to the Space Act would be necessary to grant NASA this authority. At your request, we have considered a number of alternative sources of authorization for waiver of subrogated claims. While the full scope of the President's authority in this regard is unclear, we have concluded that the President may waive claims, including subrogated claims, against foreign governments, in exchange for a reciprocal waiver from the foreign government, and he may delegate that authority to an agency head.

## I. Background

According to your submission, in mid-November 1994, NASA requested authority from the Department of State to negotiate an executive agreement with Japan establishing a mutual waiver of liability, including a waiver of subrogated claims, in connection with joint activities for the exploration of space. Article 3(2)(a) of the draft agreement provides that "[e]ach Party agrees to a cross-waiver

140

of liability pursuant to which each Party waives all claims" against the other Party and its employees as well as "related entities" and their employees for damage to property or persons. A "party" is defined in relevant part as the governments of Japan and the United States, their agencies, and institutions established by law for space development. "Related entities" are defined so as to extend the waiver to contractors and subcontractors (including suppliers), users and customers, and their contractors and subcontractors. The cross-waiver applies to any claim for damages regardless of the legal basis of the claim, including tort and contract. Article 3(2)(d) sets forth a number of exceptions to the waiver:

> Notwithstanding other provisions of this Article, this cross-waiver of liability shall not be applicable to . . . claims made by a natural person, his/her estate, survivors, or subrogees for injury or death of such natural persons [, except where the subrogee is a Party].

*Agreement Between the Government of the United States of America Concerning Cross-Waiver of Liability for Cooperation in the Exploration and Use of Space for Peaceful Purposes (Draft)*, Article 3(2)(d) (Jan. 13, 1995) (brackets in original). Thus, under the draft agreement, the U.S. Government and its agencies would waive all claims, including subrogated claims, against the Japanese government, "related entities," and employees.

As you identified in your submission, there are a number of federal statutes that may create rights in the United States to recover from responsible third parties the amount the United States pays an injured employee in benefits or treatment, including the Medical Care Recovery Act, 42 U.S.C. § 2651, the Social Security Act, 42 U.S.C. § 1395y(b)(2)(B)(iii), and the Federal Employees' Compensation Act, 5 U.S.C. § 8131. We were advised that it would be very difficult to identify definitively all sources of subrogated claims.

NASA submitted a response setting forth the basis for its position that it possesses both express and implied statutory authority to enter into broad cross-waivers of liability in its space activities, including waivers of other federal agencies' subrogated claims.[1] The National Aeronautics and Space Act of 1958, (codified as amended at 42 U.S.C. §§ 2451–2484) ("Space Act"), establishes NASA and defines its functions and the scope of its authority. In its written submission, NASA interprets section 203 of the Space Act as vesting NASA with authority to waive subrogated claims of other federal agencies. According to NASA, subsequent passage of section 308 of the Space Act, an "Insurance and Indemnification Provision," ratified this authority. Finally, NASA argues, a provision of the

---

[1] Based upon a subsequent meeting with attorneys from NASA and the Department of State, we understand that NASA does not claim authority to waive nonsubrogated claims of other federal agencies, apart from its practice of obtaining express waivers of claims for damages where the other agencies are entering into agreements with NASA for joint activity. Further, NASA does not presently purport to waive any claims of the 50 states and the District of Columbia.

Commercial Space Launch Act ("CSLA") expressly granting the Secretary of Transportation authority to waive certain claims of the United States and its agencies, 49 U.S.C. § 70112, supports NASA's interpretation of its authority. *See* Memorandum for Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, from Edward A. Frankle, General Counsel, NASA (Feb. 7, 1995) ("NASA Submission").

In this memorandum, we first analyze the possible sources of express and implied statutory authority for NASA to waive subrogated claims of other federal agencies. We next discuss alternative basis for waiver of federal claims. Finally, we examine sources of authority to waive states' claims.

## II. *Express Statutory Authority*

We do not read the Space Act to confer expressly upon NASA the authority to waive subrogated claims on behalf of other federal agencies.

NASA relies upon section 203 of the Space Act, 42 U.S.C. § 2473, which outlines the functions of NASA, to argue that Congress authorized NASA to enter into executive agreements with foreign governments on any terms it deems appropriate. NASA states that Congress "sought to create and foster a unique agency" and that due to its "distinctive mandate, the agency has been provided with concomitantly distinctive authorities" including authority "to acquire properties and enter into 'contracts, leases, cooperative agreements, and other transactions as may be necessary in the conduct of its work and *on such terms as it may deem appropriate.*' " NASA Submission at 2, 3 (quoting 42 U.S.C. § 2473(c)(5)). *See also* NASA Submission at 12, 23. The most natural reading of this passage is that Congress was directing NASA, when it went about its business, to do so according to its best judgment, not that Congress was conferring plenary authority upon NASA to take any and all actions, even those that affected the interests of other governmental entities. Moreover, reading the statute in its entirety makes clear that Congress did not confer the discretion that NASA claims. Section 203(c)(5) provides that NASA may enter into

> contracts, leases, cooperative agreements, or other transactions as may be necessary in the conduct of its work and on such terms as it may deem appropriate, *with any agency or instrumentality of the United States, or with any State, Territory, or possession, or with any political subdivision thereof, or with any person, firm, association, corporation, or educational institution.*

42 U.S.C. § 2473(c)(5) (emphasis added). Thus, Congress's broad grant to NASA of discretion to enter into agreements "on such terms as it may deem appropriate" does not extend to agreements with foreign governments.[2]

Nor does any other provision of the Space Act confer such authority. Only one provision concerns international agreements. Section 205, 42 U.S.C. § 2475, provides that NASA,

> under the foreign policy guidance of the President, may engage in a program of international cooperation in work done pursuant to this chapter, and in the peaceful application of the results thereof, pursuant to agreements made by the President with the advice and consent of the Senate.

Nothing in the text of section 205 itself, an OLC legal opinion interpreting the scope of NASA's authority to engage in international cooperative activity,[3] or the President's signing statement suggests that section 205 should be interpreted as conferring upon NASA the authority to enter into executive agreements containing government-wide waivers of claims. There are as yet no reported decisions interpreting section 205.

Finally, Congress amended the Space Act to authorize NASA to provide third party liability insurance to users of NASA's space vehicles and to indemnify users for third party liability in excess of the insurance coverage. Section 308, 42 U.S.C. § 2458b.[4] As discussed below, NASA argues that, in enacting the insurance-

---

[2] This Office previously had noted that there is "some evidence" in the legislative history that another subsection, 42 U.S.C. § 2473(b)(6)(1958), which authorizes NASA to cooperate with other government and public and private agencies, was intended to include foreign governments. Letter for Leonard C. Meeker, Legal Adviser, Department of State, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel at 3 n.1 (Apr. 29, 1969). Our review of that House Report (which accompanied the original 1958 Space Act) found no similar evidence in relation to § 2473(c)(5). H.R. Rep. No. 85–1770 (1958).

[3] Although section 205 only expressly authorizes NASA to engage in international programs pursuant to the terms of treaties entered into by the President, then-Assistant Attorney General Rehnquist concluded that international cooperation in space activity could be carried out pursuant to other forms of international agreements. (The issue before this Office was whether NASA had authority to provide launch services to a foreign government for a domestic communications satellite system and whether it could do so independently of COMSAT.) In reaching this conclusion, this Office relied upon President Eisenhower's signing statement in which he declared that he did not construe section 205 as prescribing the only permissible form of international cooperation, because "[t]o construe the section otherwise would raise substantial constitutional questions." Letter for Leonard C. Meeker, Legal Adviser, Department of State, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel at 3–4 (Apr. 29, 1969).

[4] 42 U.S.C. § 2458b provides in relevant part:

(a) Authorization

The Administration is authorized on such terms and to the extent it may deem appropriate to provide liability insurance for any user of a space vehicle to compensate all or a portion of claims by third parties for death, bodily injury, or loss of or damage to property resulting from activities carried on in connection with the launch, operations or recovery of the space vehicle. Appropriations available to the Administration may be used to acquire such insurance, but such appropriations shall be reimbursed to the maximum extent practicable by the users under reimbursement policies established pursuant to section 2473(c) of this title.

(b) Indemnification

Under such regulations in conformity with this section as the Administrator shall prescribe taking into account the availability, cost and terms of liability insurance, any agreement between the Administration

Continued

indemnification system, Congress implicitly approved NASA's practice of entering into cross-waivers of subrogated claims on behalf of other federal agencies. We do not understand NASA to take the position that section 308 itself expressly authorizes NASA to waive such claims, nor can the statute be read to do so.

## III. *Implied Statutory Authority*

We understand NASA's principal argument to be that Congress implicitly authorized NASA to waive subrogated claims on behalf of all federal agencies. First, according to NASA, the legislative history of section 308 of the Space Act (the insurance and indemnification amendment) and 49 U.S.C. §70112 (the insurance provision of the CSLA) demonstrate that Congress was aware of and approved of NASA's longstanding practice of entering into government-wide cross-waivers of subrogated claims. Second, NASA argues, the insurance-indemnification regime Congress adopted in section 308 of the Space Act can function effectively only if there are government-wide cross-waivers of subrogated claims. However, neither argument for implied congressional authorization is supported by adequate evidence.

### A. *Legislative History*

As a threshold matter, we note that reliance upon legislative history in interpreting a statute is vulnerable to challenge where the statute is unambiguous. *City of Chicago v. Environmental Defense Fund*, 511 U.S. 328 (1994); *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). There is no ambiguity in the Space Act regarding NASA's authority to waive subrogated claims on behalf of the U.S. Government. Granted, there is no express prohibition against NASA taking such action, but where an action as exceptional as waiving the claims of other agencies is concerned, silence should ordinarily not be interpreted as ambiguity or authorization. *Cf.* CSLA, 49 U.S.C. §70112(b)(2) (expressly authorizing the Secretary of Transportation to enter into reciprocal cross-waivers on behalf of the United States and certain agencies).

Moreover, NASA overstates the evidence contained in the legislative history. NASA asserts that it had a long history of consistent practice of entering into government-wide cross-waivers of subrogated claims, of which Congress was aware and which it took into account — and thereby implicitly authorized — in

and a user of a space vehicle may provide that the United States will indemnify the user against claims (including reasonable expenses of litigation or settlement) by third parties for death, bodily injury, or loss of or damage to property resulting from activities carried on in connection with the launch, operations or recovery of the space vehicle, but only to the extent that such claims are not compensated by liability insurance of the user: *Provided*, That such indemnification may be limited to claims resulting from other than the actual negligence or willful misconduct of the user.

amending the Space Act to grant NASA authority to insure and indemnify users of its space vehicles and in adopting the waiver provisions of the CSLA.

Our review of the legislative history and the executive agreements executed by NASA fails to support NASA's position in two respects. First, it appears that NASA's practice has not been uniform. NASA began to execute cross-waivers of liability during the 1970's as it undertook projects with multiple parties. According to NASA, although the cross-waiver provisions evolved over time and contained minor variations, NASA had an "open and widely-endorsed seventeen-year practice of requiring the use of broad no-fault, no-subrogation inter-party waivers of liability in its space launch activities." NASA Submission at 1. NASA has provided a number of examples of the cross-waiver provisions. A review of these agreements indicates that the scope of the waiver varies. Most provisions broadly and generally waive "claims"; at least one excludes claims subrogated to the government from the scope of the waiver. More important, there is also variability in the scope of the parties bound by the waiver.[5] In most cases, the agreement waives claims of only *NASA*, not those of other federal agencies; in others, there is ambiguity as to the scope of the parties bound by the waiver.[6]

Second, the legislative history is inconclusive. NASA emphasizes that it explained its broad and consistent cross-waiver practice to Congress in seeking indemnification authority. According to NASA, Congress relied upon NASA's practice of entering into cross-waivers in adopting section 308 of the Space Act (granting NASA indemnification and insurance authority) and in subsequently granting the Secretary of Transportation authority to waive claims under the

---

[5] Evaluating the scope of the waiver actually raises two distinct issues: whether the waiver encompasses claims of other federal agencies as well as NASA, and whether the waiver encompasses subrogated as well as nonsubrogated claims. The Department of State submitted the narrow question whether NASA has authority to waive subrogated claims of other federal agencies, and it suggests that a general waiver of claims does not necessarily encompass a waiver of subrogated claims. Similarly, NASA has focused on demonstrating that it had a long-standing practice of executing broad waivers that included waivers of subrogated claims. Although we confine our opinion to the question presented to us — whether NASA has authority to waive subrogated claims of other agencies — in our view, the issue is not whether NASA has authority to waive subrogated (as opposed to nonsubrogated) claims, but whether it has authority to waive claims, of whatever sort, of another agency. We are aware of no principle that would distinguish between subrogated and nonsubrogated claims for the purpose of analyzing waiver authority. And we are aware of no basis for interpreting a waiver of "all claims" as not including subrogated claims.

[6] A number of agreements provide that "the parties agree to a no-fault, no-subrogation inter-party waiver of liability." In most agreements that we reviewed, "parties" is defined for the purpose of the relevant section as "NASA and the User." However, in some agreements "parties" is not a defined term, and the preambles state that the agreements are entered into by "the United States of America represented by the National Aeronautics and Space Administration." Arguably then, the "party" agreeing to waive the claim is the U.S. Government. This interpretation is undercut by the fact that the provisions continue to read "[t]hus, if NASA's property, while involved in STS Operations, is damaged by the User or another user, NASA agrees to be responsible for that Damage and agrees not to bring a claim against or sue any user." *See, e.g., Agreement for Exchange of Services Between the United States of America Represented by the National Aeronautics and Space Administration and Messerschmitt - Bolkow - Blohm GMBH* (June 12, 1981). We have identified only two cooperative space agreements that unequivocally waive claims on a government-wide basis. One was executed by the President, the other by the Secretary of State. *Agreement Between the United States of America and Ukraine on Cooperation in the Exploration and Use of Outer Space for Peaceful Purposes* (Nov. 22, 1994); *Agreement Among the Government of the United States of America, Government of Member States of the European Space Agency, the Government of Japan, and the Government of Canada on Cooperation in the Detailed Design, Development, Operation, and Utilization of the Permanently Manned Civil Space Station* (Sept. 29, 1988).

CSLA. However, review of congressional reports and hearings reveals that virtually all references to waiver of claims were to *NASA* waiving *its* claims or were silent as to the scope of the parties bound by the waiver.

NASA quotes from the Senate Report that accompanied the 1980 NASA Authorization Act (which authorized the insurance-indemnification system). NASA Submission at 12 n.18. However, the Senate Report refers to waivers by NASA of its claims. In discussing the indemnification provision, the Senate and House reports state that, because of the reciprocal waiver, indemnification

> would not normally include persons who contract with NASA for launch services, since NASA expects to include in its launch agreements a provision under which the person procuring launch services agrees that he will not make a claim (and that he will hold NASA and other users harmless) for damage to his property or employees caused by NASA, other users or any other person involved. . . . In turn, NASA and other users would promise not to bring a claim against the user for damage to their property or employees.[7]

Similarly, the General Counsel for NASA, S. Neil Hosenball, testified before the House that

> With respect to inter-party liability, i.e., liability between the users and NASA, NASA has under existing authority adopted a no-fault, no-subrogation approach where NASA and each user agree not to bring a claim against the other or any other user for damage to its property or injury or death to its employees.[8]

NASA also cites to hearings unrelated to section 308 as evidence of congressional authorization. For example, NASA states that it informed Congress during the Space Shuttle Hearings "that the proposed Shuttle 'no-fault, no-subrogation cross-waiver was a continuation of the ELV practice.'" NASA Submission at 9 n.15. However, the quoted material does not appear at or surrounding the section of hearings cited by NASA.[9] Of perhaps greater significance, a written statement submitted by NASA's General Counsel explains in regard to cross-waivers:

> At this point, I would draw a distinction between what we refer to as "third-party" liability — which involves potential liability for

---

[7] S. Rep. No. 96–207, at 47 (1979), *reprinted in* 1979 U.S.C.C.A.N. 829, 831. H.R. Rep. No. 96–52, at 225 (1979).

[8] *1980 NASA Authorization: Hearings on H.R. 1756 Before the Subcomm. on Space Science and Applications of the House Comm. on Science and Technology*, 96th Cong., pt. 4, at 1943 (1979) (statement of S. Neil Hosenball, General Counsel, NASA, with attached memorandum for the record).

[9] *Space Shuttle Operational Planning, Policy and Legal Issues: Hearings Before the Subcomm. on Space Science and Applications of the House Comm. on Science and Technology*, 96th Cong. 110 (1979).

damage to property or injury to persons not involved in the Shuttle use — and "interparty liability" — that is, potential property damage and bodily injury to those flying aboard the Shuttle. With respect to "interparty" liability, we have adopted a no-fault approach where each party is responsible for insuring (or self-insuring) its own property or employees. Thus, if a user damages the Shuttle in some way, we agree not to press a claim or sue the user. Similarly, if NASA or a user were to damage another user's payload, the "damaged" user would not sue NASA or the other user.

We located only one reference to a government-wide waiver of claims. NASA submitted a written statement to a Senate subcommittee, which states that:

> All Users of the STS and the U.S. Government will agree not to make a claim or bring a legal action against each other for negligent or other acts resulting in injury or death of employees or damage or loss to property at the launch or landing site or during flight. . . .

> The U.S. Government will agree to waive its right of action against STS Users for their negligent or other acts resulting in injury or death to U.S. Government employees or damage to the Orbiter, the STS system or other U.S. Government property at the launch or landing site or during flight.[10]

Clearly, on its face and considered in isolation, this indicates that NASA was purporting to waive claims on behalf of the U.S. Government. When considered in context, however, it can be accorded little, if any, weight. First, this testimony was provided in the form of written answers to questions submitted in order to expedite the proceedings; there is no way to know by whom the written answers were ever considered. Second, NASA makes clear that its described policy regarding liability issues was "tentative," "undergoing review in NASA," and subject to review and comment by potential users. A tentative policy statement submitted in writing to a subcommittee of Congress cannot be interpreted as congressional ratification of that policy; otherwise any statement submitted to any one of the numerous congressional subcommittees would constitute ratification of the submission absent explicit rejection by Congress. *See McCaughn v. Hershey Chocolate Co.*, 283 U.S. 488, 494 (1931) ("[I]ndividual expressions" made to Committees of Congress or in discussions on the floor of the Senate, "are without

---

[10] *NASA Authorization for Fiscal Year 1979: Hearings on S. 2527 Before the Subcomm. on Science, Technology, and Space of the Senate Comm. on Commerce, Science, and Transportation*, 95th Cong., pt. 1, at 131, 132 (1978) ("*NASA Authorization FY 1979*").

weight in the interpretation of a statute.''); *Kelly v. Robinson*, 479 U.S. 36, 51 n.13 (1986) (refusing to "accord any significance" to comments made at hearings that were not made by Members of Congress and were not included in the Official House and Senate Reports).[11] Finally, this single reference to a government-wide waiver must be balanced against the numerous references to a waiver by NASA of *its* claims.[12]

The legislative history of the CSLA also is not as clear as NASA represents. In its submission, NASA states that "in authorizing the Secretary of Transportation to waive all claims on behalf of the U.S. Government, the Congress observed that such broad inter-party waivers of liability 'are a standard element in all [NASA] launch contracts.' " NASA Submission at 21. In fact, this reference to the standard element in NASA contracts was made in connection with [12]

---

[11] In its submission, NASA continues to draw from this written subcommittee testimony as follows:

> More specifically, however, NASA went on to address the very issue of subrogation for the Administration in this context by declaring that:
>
> > [T]his risk of liability to the User is lessened by the fact that the U.S. Government is frequently subrogated to the rights of an injured Government employee under the [Federal Employees Compensation Act] (5 U.S.C. 8131–8132). . . . This will tend to lessen the frequency of actions brought by an injured Government employee. [citation omitted]
>
> The cross-waiver was to be an inter-party waiver and, therefore, did not purport to reach the claims of individual persons, whether military, civil servant or contractor employees. All individuals were treated as third parties rather than second parties. What would be waived, as the quote makes clear, would be subrogated claims of the Government after it had paid for compensation to an employee for Shuttle work-related injuries.

NASA Submission at 10 & n.16. The sentence that NASA deleted from its quotation, together with the surrounding material, however, supports a different interpretation. The section in its entirety states·

> STS Users would continue to be exposed to a risk of liability if a NASA employee was injured or damaged or if a NASA contractor or one of its employees was injured or damaged and recovery was sought by the NASA employee, NASA contractor or NASA contractor employee.
>
> This risk of liability to the User is lessened by the fact that the U.S. Government is frequently subrogated to the rights of an injured Government employee under the Federal act providing for compensation to Government employees for work injuries. Under this Act, the United States may be entitled to 80% of the amount recovered from the negligent User (5 U.S.C. 8131–8132). This will tend to lessen the frequency of actions brought by an injured Government employee.

NASA Authorization FY 1979 at 132.

When read in its entirety, it is clear that the section addresses Shuttle users' continued exposure to third-party claims from employees and other natural persons. The reference to subrogation is by way of explaining that the frequency of such suits would tend to be reduced by the fact that the person would retain only 20% of any recovery. This passage does not inform one way or the other whether it was contemplated that the government would pursue or waive any claims it may have.

[12] In addition to those discussed above, *see also* H.R. Rep. No. 96–52, at 225 ("Indemnification would only be applicable to claims of third parties who are defined in subsection 308(a)(f)(3) . . . . It is envisaged that a third party would not normally include persons who contract with NASA for launch services, since NASA expects to include in its launch agreements a provision under which the person procuring launch services agrees that he will not make a claim . . . for damage . . . . In turn, NASA and other users would promise not to bring a claim against the user for damage to their property or employees."); S. Rep. No. 96–207, at 47 (same), reprinted in 1979 U.S.C.C.A.N. at 831; *International Space Activities, 1979: Hearings Before the Subcomm. on Space Science and Applications of the House Comm. on Science and Technology*, 96th Cong. 22 (1979) ("The U.S. Government would not be responsible for damage to another country's materials processing of scientific equipment on the Shuttle or during other space transportation system operations. We will include a cross-waiver provision in each Shuttle Launch Services Agreement whereby both NASA and the user, including foreign countries, agree to a no-fault, no-subrogation waiver of liability under which NASA and the user will be solely responsible for any damage to its own property involved in such operations."); *see also* Gerald J. Mossinghoff, *Managing Tort Liability Risks in the Era of the Space Shuttle*, 7 J. Space L. 121, 124 (1979) ("NASA has under existing authority adopted a no-fault, no-subrogation approach whereby NASA and each user agree not to bring a claim against the other or any other user for damage.").

subparagraph (c), which requires so-called flow-down clauses binding users and contractors to the waiver. Two paragraphs later, the report addresses the subparagraph that authorizes the Secretary of Transportation to enter into government-wide waivers; the report makes no reference to NASA's practices. S. Rep. No. 100–593, at 14 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5525, 5538. Again, where there is reference to the scope of the parties bound by the reciprocal waiver of claims, it is to NASA's waiver of its claims.[13]

NASA further states that the Department of Justice previously had reviewed and approved the waiver authority NASA now asserts. Even if this were so, it would not, of course, validate an otherwise invalid practice. According to NASA, in reviewing the proposed insurance-indemnification amendment, the Department of Justice "raised no objection to the waiver of U.S. Government claims based on its understanding of the planned broad no-fault, no-subrogation cross-waiver." NASA Submission at 11. The Department of Justice letter to which NASA refers, however, states that the department's conclusion was based on a memorandum prepared by NASA;[14] that memorandum refers only to waivers of claims that NASA may have:

> With respect to inter-party liability, i.e., liability between the users and NASA, NASA is able under present authority to adopt a no-fault, no-subrogation approach where NASA and each user agree not to bring a claim against the other or any other user for damage to its property or injury or death to its employees.[15]

Finally, NASA argues that its practice of waiving "claims" generally should be broadly construed to include subrogated claims, and further points to its references in congressional submissions to its waiver of subrogated claims to argue that, since there is no vehicle by which NASA can become a subrogee, its waiver

---

[13] *H.R. 3765, The Commercial Space Launch Act Amendments: Hearings Before the Subcomm. on Space Science and Applications of the House Comm. on Science, Space, and Technology*, 100th Cong. 12 (1988) ("NASA's standard launch services agreement, or LSA, evolved over a long period of time . . . . Perhaps the area which has been the most controversial and difficult to work out is the sharing of liability risks between NASA and its customers. . . . With regard to damage to persons and property, NASA decided that, in order to facilitate the use of the Space Shuttle and to simplify the allocation of risks, a cross-waiver policy would be put in place as a standard LSA provision. Under this policy, NASA and all Shuttle users agree to a no-fault, no-subrogation, inter-party waiver of liability . . . .")

[14] Letter for the Honorable James T. McIntyre, Jr., Director, Office of Management and Budget, from Patricia M. Wald, Assistant Attorney General, Office of Legislative Affairs (Dec. 1978) (Attachment 8 to NASA Submission).

[15] NASA Memorandum for the Record, "Proposed Section 308 of the National Aeronautics and Space Act of 1958: 'Indemnification and Insurance' " (Dec. 5, 1978).

NASA also refers to a 1987 letter from NASA to OLC, in which NASA refers to OLC's review of "a proposed Space Station inter-party waiver clause." In its current submission, NASA states that the agreements of interest to OLC "each included an express waiver of subrogated claims." NASA cites as a typical example an agreement containing a provision whereby " '[T]he Parties hereto agree to a no-fault, no subrogation, inter-party waiver of liability.' " The attachment to which NASA refers does not appear to contain the quoted agreement. Thus we are unable to determine whether the waiver was restricted to NASA or whether NASA was purporting to waive claims on behalf of other agencies. NASA Submission at 24–25, Attachment 23 (Letter for John P. Giraudo, Attorney-Advisor, Office of Legal Counsel, from Edward A. Frankle, Deputy General Counsel, NASA.)

of subrogated claims must be understood as a waiver of other agencies' claims. Even assuming the truth of the factual predicate — that NASA could never be a subrogee — we do not find this dispositive. First, the vast majority of the discussion in Congress did not refer specifically to subrogated claims. Second, even assuming that Congress was aware that the waivers encompassed subrogated claims, in light of the fact that NASA and the other party to the agreement "flowed down" the waiver to users and contractors, any reference to subrogated claims could be understood as applying to insurers of the users and contractors.[16] Finally, and most important, this connection is simply too attenuated and subtle to constitute the basis for finding congressional authorization for such an exceptional act as one agency waiving claims of other agencies.

## B. *Logic of Insurance-Indemnification System*

NASA argues that, in amending the Space Act to authorize NASA to provide insurance and indemnification, Congress must be interpreted as having either ratified or granted NASA authority to execute government-wide cross-waivers of subrogated claims because the effectiveness of the insurance-indemnification regime depended upon such waivers. Section 308 of the Space Act authorizes NASA to provide liability insurance for users of a space vehicle to compensate them for claims by third parties. (In practice, with the aid of NASA, users were able to obtain such third-party liability insurance from private insurers.) In addition, Congress authorized NASA to indemnify users for third-party loss above the amount of the insurance.[17]

Thus, according to NASA, the scheme consisted of three parts: the existing inter-party cross-waiver of claims; insurance covering third-party liability — which NASA states could only be obtained at a reasonable rate because it had removed the largest class of claims, those between the parties; and U.S. indemnification of catastrophic loss above that covered by insurance — which NASA states could be justified in light of the broad cross-waiver. NASA argues that the indemnification authority is "inextricably linked to the cross-waiver described to the Congress and implemented in accordance with policies and procedures established under the agency's broad discretionary authorities provided in . . . 42 U.S.C. § 2473(c)." NASA Submission at 12.

As we understand the three-part regime, however, the government-wide cross-waiver of subrogated claims, however sensible, is not "inextricably linked" with the insurance-indemnification regime adopted in section 308. Under the terms of

---

[16] *See* NASA Authorization FY 1979 at 132. ("This risk of liability [to the User for damage to property or employees of the United States] may also be mitigated by action taken as a result of a NASA study now under way on the feasibility of including a provision in NASA's contracts that would require NASA contractors to obtain insurance without the right of subrogation, which would provide insurance payable to themselves and their employees for damage and injury caused by other Users in the course of STS operations.").

[17] *See supra* note 4.

at least the draft agreement with Japan and the Intergovernmental Agreement among the United States, Member States of the European Space Agency, Japan, and Canada,[18] the cross-waivers do not extend to extinguish claims brought by "natural persons." And at least under the terms of the Medical Care Recovery Act and the application of FECA, the U.S. Government would recover only the amount it had expended in providing medical or other support to the injured person. Thus, unless the injured person assigned his or her entire cause of action to the U.S. Government, in many, if not most cases, the amount recovered by the United States in pursuing subrogated claims is likely to be quite limited in comparison to that potentially obtained by the individual. Since, as NASA explains, the cross-waiver does not purport to reach the claims of individual persons and all individuals would be treated as third parties, it is difficult to see that waiver of *inter*-party claims would affect *third* party insurance rates or indemnification costs. Moreover, as NASA emphasizes, NASA contractually extinguishes the bulk of nonsubrogated claims of other federal agencies that are either users or contractors by executing mutual waivers of claims and "flowing-down" the waiver to subcontractors and customers. Finally, according to NASA, the real financial exposure was to the risk that the launch vehicle and other payloads would be destroyed. This is precisely the exposure that is eliminated by the waivers among and between the users and NASA. And this presumably is what made the insurance premium affordable.

Even if we are incorrect in our assumptions regarding the actual operation of the insurance-indemnification regime, the link between enactment of section 308 of the Space Act and the waiver authority NASA claims — that insurance premiums and indemnification would be more affordable — is not sufficiently direct or express to constitute congressional authorization.

Finally, NASA argues that the waiver provision contained in the CSLA is based upon and must be read to reaffirm NASA's government-wide cross-waivers of subrogated claims. (As stated above, the CSLA expressly authorizes the Secretary of Transportation to enter into reciprocal waivers "for the Government, executive agencies of the Government involved in launch services, and contractors and subcontractors involved in launch services." 49 U.S.C. § 70112(b)(2).) Rather, if anything, the CSLA waiver provision undercuts NASA's argument that the Space Act provides the necessary authorization; the waiver provision of the CSLA demonstrates what Congress does when it wishes to authorize government-wide waivers. Moreover, the waiver authority contained in the CSLA is more narrow than that asserted by NASA under the Space Act; it extends only to those agencies involved in launch services. On its face, it would not apply to agencies that are

---

[18] *Agreement Among the Government of the United States of America, Government of Member States of the European Space Agency, the Government of Japan, and the Government of Canada on Cooperation in the Detailed Design, Development, Operation, and Utilization of the Permanently Manned Civil Space Station* (Sept. 29, 1988).

subrogated to claims or that have direct claims to reimbursement by virtue of providing care or resources to injured persons.

## IV. *President's Constitutional Authority*

We have concluded that the President may enter into international agreements providing for the waiver of subrogated claims of federal agencies in return for a reciprocal waiver from the other State. This conclusion, however, is subject to the following challenges and limitations.

The President's authority to enter into international agreements containing such a waiver derives principally from his constitutional authority to conduct foreign affairs. The Constitution has long been interpreted to grant the President plenary authority to represent the interests of the United States in dealings with foreign States, subject only to limits specifically set forth in the Constitution or to such statutory limitations that the Constitution permits Congress to impose by exercise of its enumerated powers.[19] As part of this authority, the President may enter into "sole" executive agreements — international agreements based on the President's own constitutional powers.[20]

Although the President's authority to enter into sole executive agreements is well established, the precise limitations that may exist on the proper scope of those agreements is far from settled. As one commentator has noted, "[c]onstitutional issues and controversies have swirled about executive agreements concluded by the President wholly on his own authority. . . . Periodically, Sen-

---

[19] Memorandum for the Attorney General, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel, *Re: Legal Authority for Recent Covert Arms Transfers to Iran* (Dec. 17, 1986); Letter for the Honorable David L. Boren, Chairman, Senate Select Committee on Intelligence, United States Senate, from John R. Bolton, Assistant Attorney General, Office of Legislative Affairs (Nov. 13, 1987). *See generally United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319–20 (1936) (Power of the President as "the sole organ of the federal government in the field of international relations . . . does not require as a basis for its exercise an act of Congress.")

In *Curtiss-Wright*, the Court drew a distinction between the President's relatively limited inherent powers to act in the domestic sphere and his far-reaching discretion to act on his own authority in managing the external relations of the United States. Waiving claims of, for example, the Departments of Labor or Health and Human Services to recover expenses incurred in providing resources to injured workers implicates domestic as well as foreign affairs. However, as a leading commentator notes in discussing limits to treaty-making power, "[m]atters of international concern are not confined to matters exclusively concerned with foreign relations. Usually, matters of international concern have both international and domestic effects, and the existence of the latter does not remove a matter from international concern." Louis Henkin, *Foreign Affairs and the Constitution* 153 (1972) (quoting Restatement of the Law of United States Foreign Relations § 117(1)). Moreover, to the degree domestic interests are implicated, they arise in areas in which the President possesses considerable authority, as discussed below.

[20] *United States v. Belmont*, 301 U.S. 324 (1937); *United States v. Pink*, 315 U.S. 203 (1942); *Dames & Moore v. Regan*, 453 U.S. 654 (1981); Restatement (Third) of The Foreign Relations Law of the United States § 303(4) (1987) ("Restatement") ("Subject to [the prohibitions or limitations in the Constitution applicable to the exercise of authority by the United States] the President, on his own authority, may make an international agreement dealing with any matter that falls within his independent powers under the Constitution."); *see also* State Department Procedures on Treaties and Other International Agreements, Circular 175 (Oct. 25, 1974) ("Circular 175"), *reprinted in* 1 *United States Foreign Relations Law: Documents and Sources* 201 (Michael J. Glennon & Thomas M. Franck eds., 1980).

We note that government-wide waivers of subrogated claims could be implemented through treaties or congressional-executive agreements. We focus here on sole executive agreements, based on our understanding that NASA and the State Department seek advice on the availability of alternatives to congressional authorization.

ators (in particular) have objected to some agreements, and the Bricker Amendment sought to curtail or regulate them, but the power to make them remains as vast and its constitutional foundations and limits as uncertain as ever.''[21]

The leading cases on sole executive agreements support — though not unequivocally — the President's authority to enter into agreements disposing of government claims. In *United States v. Belmont*, 301 U.S. 324 (1937), and *United States v. Pink*, 315 U.S. 203 (1942), the Court upheld the validity of the Litvinov Assignment, by which, through exchange of diplomatic correspondence, the Soviet Union assigned to the United States its claims against U.S. nationals. The Litvinov Assignment was part of an overall settlement of claims between the Soviet Union, the United States, and their nationals, undertaken to clear the way for United States recognition of the Soviet government.

The *Belmont* and *Pink* opinions establish the President's broad authority to enter into sole executive agreements that deal with international claims. However, the Litvinov Assignment was executed pursuant to the President's recognition of the Soviet Union, and the opinions rely in part on that fact. Accordingly, it could be argued that they support only the limited proposition that the President may enter into sole executive agreements that accompany the exercise of his core power to recognize foreign governments. We reject this narrow reading. The opinions impose no such restriction, but rather, find authority for the Assignment in the President's authority as ''sole organ'' of the federal government in the field of international relations.[22] Even so, *Belmont* and *Pink* are not dispositive because, although the Litvinov Assignment anticipated an overall settlement of claims between the two governments, the Assignment itself appears only to have involved the assignment of Soviet claims to the United States — not the release by the United States of its claims.

---

[21] Henkin, *Foreign Affairs and the Constitution* at 177 (footnotes omitted). *See also* Restatement § 303, reporters' note 11 (''Efforts to define the constitutional limits on the President's authority to make sole executive agreements . . . have been resisted by the Executive Branch and have not gained wide acceptance in Congress.''); Peter M. Shane & Harold H. Bruff, *The Law of Presidential Power* 543 (1988) (noting the lack of any ''principled line'' to identify the limit of constitutional sole executive agreements: ''The Supreme Court has not yet held any executive agreement ultra vires for lack of Senate consent, nor has it given other guidelines that might define the President's power to act alone. Members of the Senate have periodically charged presidential usurpation, but have not articulated plausible limits to presidential power. . . . Presidential practice, too, has not reflected any principle of limitation.'').

[22] *See* Department of State Legal Adviser's Reply to Senate Office of Legislative Counsel Memorandum on Certain Middle East Agreements (Oct. 6, 1975), *reprinted in* 1 *United States Foreign Relations Law: Documents and Sources* 295 (Michael J. Glennon & Thomas M. Franck eds., 1980) (rejecting the argument that *Belmont* and *Pink* should be narrowly interpreted as only authorizing agreements pursuant to recognition of foreign states); Henkin, *Foreign Affairs and the Constitution* at 178–79 (''Sutherland in fact seemed to find authority for the Litvinov Agreement not in the President's exclusive control of recognition policy but in his authority as 'sole organ,' his 'foreign affairs power' which supports not only recognition but much if not most other foreign policy.'').

At the same time, Professor Henkin rejects a fully expansive reading. ''There have indeed been suggestions, claiming support in *Belmont*, that the President is constitutionally free to make any agreement on any matter involving our relations with another country. . . . As a matter of constitutional construction, however, that view is unacceptable, for it would wholly remove the 'check' of Senate consent which the Framers struggled and compromised to write into the Constitution. One is compelled to conclude that there are agreements which the President can make on his sole authority and others which he can make only with the consent of the Senate, but neither Justice Sutherland nor any one else has told us which are which.'' *Id.* at 179.

In *Dames & Moore v. Regan*, 453 U.S. 654 (1981), the Court upheld the President's authority to suspend individuals' claims pursuant to an executive order that, among other things, established the U.S.-Iran Claims Tribunal. In addition to relying upon the "general tenor" of the International Emergency Economic Powers Act, the Hostage Act, and the International Claims Settlement Act[23] (which the Court found implicitly to authorize the challenged executive action), the Court emphasized the U.S. Government's longstanding practice of exercising its sovereign authority to settle claims of its nationals against foreign governments and noted that those settlements frequently occur through executive agreements.[24]

If the President has authority to dispose of claims of individuals in furtherance of U.S. foreign policy objectives, it would seem reasonable to conclude that he must have authority to waive claims of federal agencies. *Dames & Moore*, however, did not so squarely raise separation of power concerns. Here, arguably, the President would be encroaching on Congress's control over the federal fisc by declining to recover monies otherwise subject to claim by the United States.[25] Although this argument is not without force, we are not persuaded by it in its current context, and we conclude that there would be no impermissible encroachment upon congressional authority. First, this is not an instance of the executive branch bestowing a unilateral gift. The waivers are mutual. The United States is getting what it gives. More important, the President's action must be considered against the backdrop of the statutes governing NASA and its operations. By enacting the insurance-indemnification scheme, Congress expressed its intent to commit very substantial resources to support NASA's activities. In contrast to the indemnification system of the CSLA, which caps the government's indemnification at a certain amount, Congress granted NASA unlimited indemnification authority. In addition, Congress endorsed a program of international cooperation, placed NASA under the foreign policy guidance of the President, and granted the President the authority to enter into international agreements to promote inter-

---

[23] 50 U.S.C. § 1701; 22 U.S.C. § 1732; 22 U.S.C. §§ 1621–1645, respectively.

[24] *See also Ozanic v. United States*, 188 F.2d 228, 231 (2d Cir. 1951) (Hand, J.) ("The constitutional power of the President extends to the settlement of mutual claims between a foreign government and the United States, at least when it is an incident to the recognition of that government; and it would be unreasonable to circumscribe it to such controversies. The continued mutual amity between the nation and other powers again and again depends upon a satisfactory compromise of mutual claims; the necessary power to make such compromises has existed from the earliest times and [has] been exercised by the foreign offices of all civilized nations."); Harold Hongju Koh, *Why the President (Almost) Always Wins in Foreign Affairs: Lessons of the Iran-Contra Affair*, 97 Yale L.J. 1255 (1988) (noting the great deference accorded to presidential authority by the model of statutory analysis adopted in *Dames & Moore*).

[25] For example, the Constitution dictates that only Congress can appropriate money. U.S. Const. art. 1, § 9, cl. 7. And courts have suggested that the President may not act alone to dispose of property under Article IV. *See Edwards v. Carter*, 580 F.2d 1055 (D.C. Cir.), *cert. denied*, 436 U.S. 907 (1978). We do not find these restrictions dispositive because appropriations are not properly equated with waivers of claims, and the property referenced in Article IV of the Constitution does not appear to encompass inchoate claims for damages. *Id.* at 1059 (reviewing debates of Constitutional Convention and state ratifying conventions to demonstrate that the property clause was intended to delineate the role played by the central government in the disposition of Western lands).

national cooperation.[26] Finally, Congress has at least implicitly approved of the long-standing practice of NASA and other federal agencies that are using NASA's services waiving their own claims for damages, which likely represents the greatest risk of financial exposure to the United States.[27]

Taken together, we believe that this statutory framework supports the conclusion that the President would not encroach upon congressional authority by entering into a mutual waiver of claims with a foreign State. Moreover, waiving claims for damages coincides with two other sources of Presidential power: the President's prosecutorial discretion and his authority as chief administrator of the executive branch.[28] Conceptually, a waiver operates similarly to a decision not to pursue a certain class of claims — an executive decision that is generally within the prerogative of the President.[29]

We further conclude that the President may delegate this authority to an appropriate agency head. The President is generally authorized under 3 U.S.C. § 301 to delegate to heads of executive agencies "any function which is vested in the President by law." This Office has interpreted § 301 as conferring a very broad grant of delegation authority. However, the legislative history indicates that § 301 was intended only to authorize the delegation of functions vested in the President by statute.[30]

---

[26] 42 U.S.C. § 2475. Although the statute refers only to treaties, President Eisenhower and this Office interpreted the statute as authorizing other forms of international executive agreements. *See supra* note 3.

[27] *See supra* note 12.

[28] *See Myers v. United States*, 272 U.S. 52 (1926); *Heckler v. Chaney*, 470 U.S. 821 (1985); *The Jewels of the Princess of Orange*, 2 Op. Att'y Gen. 482, 491–92 (1831) ("Upon the whole, I consider the district attorney as under the control and direction of the President . . . and that it is within the legitimate power of the President to direct him to institute or to discontinue a pending suit . . . ."); Shane & Bruff, *The Law of Presidential Power* at 327 (quoting Geoffrey P. Miller, *Independent Agencies*, 1986 Sup. Ct. Rev. 41, 44 (1987) ("The President retains the constitutional power to direct the officer to take particular actions within his or her discretion or to refrain from acting when the officer has discretion not to act.").

[29] We note that, like treaties, an executive agreement authorizing the waiver of claims would be superseded by subsequent contrary congressional action. Furthermore, unlike treaties, a sole executive agreement may not be effective in the face of prior inconsistent legislation. Thus, if there is an extant statute requiring an agency to bring suit to recover certain costs, an executive agreement to the contrary may have no effect. According to Henkin, the Supreme Court has expressly declined to consider this issue. Henkin, *Foreign Affairs and the Constitution* at 186. *See United States v. Guy W. Capps, Inc.*, 204 F.2d 655 (4th Cir. 1953) (holding that an executive agreement will not be given effect as against an earlier act of Congress), *aff'd*, 348 U.S. 296 (1955); Circular 175 at 205 ("The President may conclude an international agreement on any subject within his constitutional authority so long as the agreement is not inconsistent with legislation enacted by the Congress in the exercise of its constitutional authority."); Restatement § 303 cmt. j (status of sole executive agreements in relation to earlier congressional legislation has not been authoritatively determined); Oliver J. Lissitzyn, *The Legal Status of Executive Agreements on Air Transportation*, 17 J. Air L. & Com. 436, 444 (1950) ("[W]hile a treaty, if self-executing, can supersede a prior inconsistent statute, it is very doubtful whether an executive agreement, in the absence of appropriate legislation, will be given similar effect."); *see also* Memorandum for the Honorable David Stockman, Director, Office of Management and Budget, from Larry L. Simms, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Proposed Executive Order on Federal Regulation* at 3 (Feb. 12, 1981) ("[T]he President's exercise of supervisory powers must conform to legislation enacted by Congress. In issuing directives to govern the Executive Branch, the President may not, as a general proposition, require or permit agencies to transgress boundaries set by Congress." (footnote omitted)).

[30] The House Report of the precursor statute to § 301 states that "it should be understood that the functions, as set out in this bill, refer to those vested in the President by statutory authority, rather than those reposing in the President by virtue of his authority under the Constitution of the United States." H.R. Rep. No. 81-1139, at

Continued

The scope and source of the President's authority to delegate responsibility conferred upon him by the Constitution is less clear. We have recognized that the President possesses "inherent" authority to delegate, and that this is not restricted to delegation of duties conferred by statute.[31] In *Myers v. United States*, 272 U.S. 52, 117 (1926), the Court declared the general principle sustaining the delegation by the President of the exercise of his executive authority:

> The vesting of the executive power in the President was essentially a grant of the power to execute the laws. But the President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates.

We have endorsed the statement of the exception to this general rule expressed by one commentator that

> Where . . . from the nature of the case, or by express constitutional or statutory declaration, the personal, individual judgment of the President is required to be exercised, the duty may not be transferred by the President to anyone else.[32]

Thus, this Office has concluded that the President may not delegate his authority to undertake specific functions that are expressly vested in him by the Constitution, such as to grant a pardon, or to transmit and proclaim the ratification of a treaty.[33] And we have suggested that there may be greater limits on his delegation authority in the area of foreign affairs. For instance, we have advised that it would be "safer" to conclude that the President may not delegate his authority to terminate international trade agreements, and to carry out certain duties relating to military assistance, defense programs, and foreign aid. This limitation is based on the view that these were "basic decisions relating to international relations and involve[d] far-reaching policy considerations."[34] The waivers at issue here, in contrast, do not implicate, at least in their individual application, far-reaching

---

2 (1949). In addition, there are numerous references to the need to provide for delegation of *statutory* duties in other legislative history. S. Rep. No. 81– 1867, (1950), *reprinted in* 1950 U.S.C.C.A.N. 2931.

[31] "In none of the Reports of the Congress [concerning 3 U.S.C. §§ 301–303] is there any definition of the inherent right of the President to delegate the performance of functions vested in him, but both Reports, as well as the Act, recognize that the President has such an inherent right" to the extent "reasonably necessary in executing the express powers granted to him under the Constitution and Laws of the United States for the proper and efficient administration of the executive branch of government." Memorandum from Office of Legal Counsel, *Re: President's Authority to Delegate Functions* at 3 (Jan. 24, 1980) ("Generally, it may be said that the inherent rights or implied powers of the President are all those vast powers which are reasonably necessary in executing the express powers granted to him under the Constitution and Laws of the United States for the proper and efficient administration of the executive branch of government.").

[32] Memorandum, *Re: President's Authority to Delegate Functions* (Jan. 24, 1980) (quoting Willoughby, *Constitution*, Vol. II, p. 1160).

[33] Memorandum from the Office of Legal Counsel, *Re: Delegation of Presidential Functions*, (Sept. 1, 1955).

[34] *Id.* at 7.

policy considerations. The President would exercise his individual judgment that mutual, government-wide waivers under these particular circumstances are in the public interest; he would delegate merely the application of that judgment to particular agreements. Accordingly, we conclude that the President may delegate his authority to enter into mutual waivers of claims for damages that arise pursuant to cooperative space activity.

## V. *Authority to Waive States' Claims*

You have also asked us to advise whether the federal government could bind the fifty states and the District of Columbia to a waiver of state claims. NASA correctly notes that under the terms of its agreements, it does not purport to waive states' claims. However, when federal states enter into international agreements, they are generally viewed as binding their constituent units as well as the central government.[35] Moreover, absent an express agreement to the contrary, the central government generally is responsible for the failure of the constituent units to fulfil their legal obligations.[36]

---

[35] Memorandum for Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, from Conrad K. Harper, Legal Adviser, Department of State (May 5, 1995).

[36] Ivan Bernier, *International Legal Aspects of Federalism* 88 (1973) (As a matter of international law, "there can be no doubt that a federal state is responsible for the conduct of its member states."). According to the Restatement, federal states sometimes have sought special provisions in international agreements to take account of restrictions upon the power of the central government to deal with certain matters by international agreement. "Some proposed 'federal-state clauses' would permit a federal state to leave implementation to its constituent units, incurring no violation of international obligation if implementation fails. Even without a special provision, a federal state may leave implementation of its international obligations to its constituent units, but the central government remains responsible if the obligation is not fulfilled." Restatement § 302, reporters' note 4.

We note that the State Department construed the "flow-down" clause of the Intergovernmental Agreement Among the United States, Member States of the European Space Agency, Japan, and Canada (which obligates each signatory to extend the cross-waiver of liability to its own related entities) as follows:

> Each Partner may decide how it intends to implement this obligation, for example, by including the cross-waiver in its contracts with related entities, by enacting legislation, or by any other appropriate means. However, if a Partner had reason to believe that the cross-waiver would not be enforceable under its laws, that Partner should take reasonable steps to enforce the cross-waiver by alternative means, such as by legislation. The Partner's obligation under this paragraph is to take the necessary and appropriate steps to achieve the result; however, it is not an obligation to guarantee the result. Thus, it was recognized that, under extraordinary circumstances, a Partner's domestic court might not enforce the cross-waiver, and that Partner would not be responsible for the resulting liability on the theory that it had breached an obligation. At the same time, a Partner could be expected to take certain steps to minimize the likelihood of such cases.

Memorandum of Law from Alan J. Kreczko, Deputy Legal Adviser, Department of State, *Re: Circular 175: Request for Authority to Conclude an Intergovernmental Agreement with Member States of the European Space Agency, Japan, and Canada and Implementing Memoranda of Understanding Between NASA and the European Space Agency, Canada's Ministry of State for Science and Technology, and the Government of Japan on Cooperation in the Detailed Design, Development, Operation, and Utilization of the Permanently Manned Civil Space Station* at 15–16.

It is not clear from the State Department's memorandum what the basis was for its interpretation and conclusion (e.g., a subsequently deleted provision) and whether the interpretation applied to the cross-waiver generally or only the "flow-down" obligation. If it did not apply to the cross-waivers between the various governments, and absent any other provision, then if a U.S. state successfully brought suit against Japan for damages sustained from activities undertaken pursuant to the agreement between the United States and Japan, Japan might have a claim against the United States for indemnification.

It is a fundamental principle of our constitutional law that our foreign affairs are governed by the federal government and that the state governments may not interfere.[37] Moreover, sole executive agreements that purport to create legal obligations, like statutes and treaties, are "the supreme Law of the Land" for purposes of the Supremacy Clause, U.S. Const. art. VI, cl. 2, and thus bind the states.[38] Accordingly, it would seem that there would be no question but that the federal government could, in pursuance of its foreign policy objectives, prohibit states from bringing certain claims against foreign countries. Yet, as Professor Henkin notes, despite many such "light, flat statements" that U.S. foreign relations are strictly national, they "are not in fact wholly insulated from the States." [39] Not surprisingly, the scope of state authority in this regard is not well defined.

The Supreme Court has upheld limitations imposed on the states by the federal government in matters concerning foreign affairs. In both *Belmont* and *Pink*, the Court held that the Litvinov Assignment — a sole executive agreement — would prevail over any inconsistent state policy.[40] In *Zschernig v. Miller*, 389 U.S. 429 (1968), the Court held that Oregon inheritance law that required probate courts to inquire into the type of government in particular foreign countries before

---

[37] *See e.g., Belmont*, 301 U.S. at 331 ("[C]omplete power over international affairs is in the national government and is not and cannot be subject to any curtailment or interference on the part of the several states. In respect of all international negotiations and compacts, and in respect of our foreign relations generally, state lines disappear." (citations omitted)); *Pink*, 315 U.S. at 232 ("If state laws and policies did not yield before the exercise of the external powers of the United States, then our foreign policy might be thwarted These are delicate matters. If state action could defeat or alter our foreign policy, serious consequences might ensue. The nation as a whole would be held to answer if a State created difficulties with a foreign power."); Laurence H. Tribe, *American Constitutional Law* § 4–6, at 230 (2d ed. 1988) (noting the general constitutional principle that, "whatever the division of foreign policy responsibility *within* the national government, all such responsibility is reposed at the national level rather than dispersed among the states and localities").

[38] Restatement § 1, reporters' note 5 ("There are no clear cases, but principle would support the view that the federal government can preempt and exclude the States not only by statute but by treaty or other international agreement, and even by executive acts that are within the President's constitutional authority."); Restatement § 115, reporters' note 5 ("A sole executive agreement made by the President on his own constitutional authority is the law of the land and supreme to State law."); Memorandum for Conrad Harper, Legal Adviser, Department of State, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Enforceability of Penalty-Related Assurances Provided to Foreign Nations in Connection with Extradition Requests* (Nov. 18, 1993) (noting that sole executive agreements, valid under the President's own constitutional powers, preempt inconsistent state laws).

[39] Henkin, *Foreign Affairs and the Constitution* at 228.

[40] *United States v. Belmont*, 301 U.S. 324 (1937); *United States v. Pink*, 315 U.S. 203 (1942). Again, it could be argued that *Belmont* and *Pink* are distinguishable because they involved the President's exclusive constitutional power to recognize foreign governments and to normalize diplomatic relations. But, again, the language of both opinions has been read to sanction a broader scope of federal power. As Professor Henkin has written:

> [I]t has been suggested that the doctrine of the Belmont case gives supremacy over state law only to executive agreements intimately related to the President's power of recognition, and that even such agreements will supersede only state public policy not formal state laws. Neither of these limitations was expressed — or implied — in *Belmont*, or in the *Pink* case decided five years later by a reconstituted Supreme Court. While *Pink* makes much of the relation of the Litvinov Assignment to the recognition of the Soviet Government, the language and the reasoning of both cases would apply as well to any executive agreement and to any state law.

Henkin, *Foreign Affairs and the Constitution* at 185. *See also* Department of State Legal Adviser's Reply to Senate Office of Legislative Counsel Memorandum on Certain Middle East Agreements (Oct. 6, 1975), *reprinted in* 1 *United States Foreign Relations Law: Documents and Sources* 295, 303–04 (Michael J. Glennon & Thomas M. Franck eds., 1980).

permitting citizens of those countries to inherit property from Oregon residents was an invalid intrusion into the field of foreign affairs. *See also Missouri v. Holland*, 252 U.S. 416 (1920) (upholding, against state's tenth amendment challenge, federal statute that executed a treaty protecting migratory birds).

We are aware of no cases upholding state challenges to federal international agreements on the ground of impermissible interference with state sovereignty.[41] There is, however, dicta suggesting hypothetical constitutional limitations on the federal government's ability to enter into international agreements that override state law. *See Geofroy v. Riggs*, 133 U.S. 258, 267 (1890) ("It would not be contended that [the treaty power] extends so far as to authorize what the constitution forbids, or a change in the character of the government or in that of one of the States, or a cession of any portion of the territory of the latter, without its consent."); *Islamic Republic of Iran v. Pahlavi*, 62 N.Y.2d 474, 486 (1984) ("[I]t is questionable whether the Federal Government could guarantee a New York forum by treaty without violating constitutional principles of federalism and separation of powers."), *cert. denied*, 469 U.S. 1108 (1985).

It could perhaps be argued that the states' right at issue here — the ability to bring claims to recover monies due the state — is a core state prerogative and more like the hypothetical examples of impermissible encroachments on the states than, for instance, the state policy against giving effect to confiscations of assets situated in the state and the inheritance laws at issue in *Belmont, Pink*, and *Zschernig*. However, this seems strained as compared to the federal government's undisputed authority to maintain friendly relations with foreign governments, which, arguably, could be compromised by suits filed by states. We believe the weight of authority supports the President's power to waive states' claims against a foreign government.

TERESA WYNN ROSEBOROUGH
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[41] It is generally accepted that the Tenth Amendment does not apply to impose limits on the subject matter of international agreements. *Missouri v. Holland*, 252 U.S. at 434 (federal treaty power is not checked by any "invisible radiation from the general terms of the Tenth Amendment"); *Reid v. Covert*, 354 U.S. 1, 18 (1957) (plurality opinion) ("To the extent that the United States can validly make treaties, the people and the States have delegated their power[s] to the National Government and the Tenth Amendment is no barrier."); Restatement § 302 cmt. d ("[T]he Tenth Amendment . . . does not limit the power to make treaties or other agreements.").